IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

_____
                                )
**UNITED STATES OF AMERICA,**        )
                                )
        Plaintiff,              )
                                )
vs.                             )Case No.:  2:22-cr-53-SPC-NPM
                                )
**RICHARD EDWARD BRILLHART,**        )
                                )
        Defendant.             )
_____)

**MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE SHERI POLSTER CHAPPELL**

**February 22, 2023**
**9:30 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:   YOLANDE G. VIACAVA, ESQUIRE**
                       United States Department of Justice
                       Office of the United States Attorney
                       2110 First Street, Suite 3-137
                       Fort Myers, Florida 33901


**FOR THE DEFENDANT:   JOSEPH A. DAVIDOW, ESQUIRE**
                       Willis & Davidow LLC
                       9015 Strada Stell Court, Suite 106
                       Naples, Florida 34109


**COURT REPORTER:**       Stacey E. Raikes, RMR, CRR
                       2110 First Street, Suite 2-194
                       Fort Myers, Florida 33901


**ALSO PRESENT:  RICHARD EDWARD BRILLHART**, Defendant.


Proceedings reported and transcribed by computer-aided stenography.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

JORDYN B. KRAMER

Direct examination by Ms. Viacava.............     6
Cross-examination by Mr. Davidow..............    46

ANJALI SHRESTHA

Direct examination by Ms. Viacava.............    87
Cross-examination by Mr. Davidow..............   116
Redirect examination by Ms. Viacava...........   138
Recross-examination by Mr. Davidow...........   140

KATRINA LEE

Direct examination by Ms. Viacava.............   143
Cross-examination by Mr. Davidow..............   183
Redirect examination by Ms. Viacava..........   191

EXHIBITS

On behalf of the Government:

Admitted

Number 1A - 1D.....................................     5
Number 2A - 2B.....................................     5
Number 3A - 3C.....................................     5
Number 4A - 4D.....................................     5
Number 5A - 5B.....................................     5
Number 6..........................................     5
Number 7..........................................     5
Number 8..........................................     5
Number 9A - 9B.....................................     5
Number 10.........................................     5

On behalf of the Defendant:

Admitted

Number 10.........................................     5
Number 11.........................................     5
Number 12.........................................     5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

P R O C E E D I N G S

(Court called to order.)

THE DEPUTY CLERK:  Calling case 2:22-cr-53-SPC-NPM: The United States of America versus Richard Edward Brillhart.

THE COURT:  Counsel, if you would introduce yourselves for the record, please.

MS. VIACAVA:  Good morning.  Yolande Viacava representing the government.  And with me at counsel table is HSI special agent Soleil Randall.

THE COURT:  Good morning.

MR. DAVIDOW:  Good morning, Your Honor.  Joseph Davidow here on behalf of Mr. Brillhart.  Mr. Brillhart is present at counsel table.

THE COURT:  Good morning.

Mr. Brillhart, your counsel has filed a motion to suppress on your behalf, to which the government has responded, so we're here today for a hearing on that motion.

There's no question that Mr. Brillhart does have standing to challenge what he is listing in his motion.  So, therefore, is the government prepared to go forward at this time?

MS. VIACAVA:  Yes, Your Honor.  And both defense counsel and the government have spoken regarding the exhibits. In looking at defense counsel's list, many of the exhibits appear to be the same exhibits.  So, as a result, in speaking

with defense counsel, I believe there's a stipulation to move in all of the Government's Exhibits 1 through 10 and the government has agreed to stipulate to moving in defense counsel's Exhibits 10, 11, and 12, which are the only different exhibits on his list.

THE COURT:  All right.

Is that correct, Mr. Davidow?

MR. DAVIDOW:  Yes, Your Honor.  There's -- as to the introduction of those exhibits, many of them were the same. There's a section of the exhibits that -- they're the privacy statements and things of that nature, and those, I mean, again, the introduction of those exhibits would come in, anyway, so there's no reason to waste court time.  It's just the arguments for which would be made as to how they apply, obviously, we reserve those to make those when appropriate.

THE COURT:  All right.  Then based upon the stipulation, Government's Exhibits 1A through D composite, 2A through 2A and B composite, 3A through C composite, 4A through D composite, 5A through -- and B composite, 6, 7, 8 composite, 9A and B composite, and 10 will be introduced.

In regard to the Defendant's Exhibits, pursuant to stipulation, Defense Exhibits 10, 11, and 12, will be introduced.  So we have all of the evidence, physical evidence, that we'll be referring to based upon those stipulations.

(Government's Exhibit Numbers

1A - 1D, 2A - 2B, 3A - 3C, 4A - 4D, 5A - 5B, 6, 7, 8, 9A - 9B, and 10, admitted into evidence.)

(Defendant's Exhibit Numbers 10, 11, 12 admitted into evidence.)

THE COURT:  All right.  That being the case, then you may proceed.

MS. VIACAVA:  Your Honor, may I just approach for a moment?

THE COURT:  Yes.

MS. VIACAVA:  I was putting up the government's exhibits on the table so defense counsel has access to them.  If I may approach?

THE COURT:  Yes.

MS. VIACAVA:  Thank you.

Your Honor, at this time, the government would call its first witness.  The government would call Jordyn Kramer to the stand.

THE COURT:  If you want to turn that podium a little bit so it's more comfortable for you to examine the witness, you may do so.

MS. VIACAVA:  Thank you, Your Honor.

THE COURT:  Ms. Kramer, if you would step forward towards the witness box.  And then please turn and raise your right hand and she'll swear you in.

THE DEPUTY CLERK:  Do you solemnly swear or affirm that the testimony you're about to give in the case that is now before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE DEPUTY CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Jordyn Blair Kramer.  Just spell the last name?

THE DEPUTY CLERK:  Yes, please.

THE WITNESS:  Kramer.  K-R-A-M-E-R.

THE DEPUTY CLERK:  Thank you.

THE COURT:  If you don't mind pulling up to the microphone or pulling the microphone towards you, whichever you prefer so you're comfortable.

You may inquire.

Thereupon,

JORDYN B. KRAMER,

Having been called as a witness on behalf of the Government, and having been first duly sworn by the Courtroom Clerk, was examined and testified as follows:

(Time noted:  9:34 a.m.)

DIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT

BY MS. VIACAVA:

Q.      Good morning.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.       Good morning.

Q.       How are you employed?

A.       I am currently an investigator on the e-crimes team at Yahoo.

Q.       And what type of position do you hold?  When you talk about the e-crimes --

A.       Okay.

Q.       -- what type of --

A.       So we investigate cyber crimes.  So any crimes that are conducted on our platforms or targeting our platforms. That would be fraud, anything that is harmful or abusive to our users or to our platform, anything of a cyber crime nature.

Q.       And you're employed by Yahoo?

A.       Yes.

Q.       And how long have you worked for Yahoo?

A.       Just over six years.

Q.       And just briefly, what type of company is Yahoo?

A.       Yahoo is a media and technology company.  We produce a lot of content.  We are an email service provider.

Q.       And as such, are you aware of whether or not -- you talk about e-crimes.  Is that a unit that Yahoo developed and put together?

A.       Yes.

Q.       What is the purpose of the unit that you belong to?

A.       The purpose is to investigate any type of criminal

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

activity on our platforms or any violations of our terms of services on the platform.

Q.      And to your knowledge, does Yahoo have an interest in protecting their platform?

A.      Absolutely.  Obviously, Yahoo is not only a company, but it is a brand.  It is a longstanding company and brand.  Part of our team's job is to help protect the company and the brand by ensuring that the platform is safe from users posting and producing and sharing harmful content.  So we have a business interest to protect our reputation and our brand and to protect our users so that they want to stay with us.

Q.      And to your knowledge, while working with Yahoo, are there procedures in place that Yahoo follows if harmful material, such as child pornography is found on the platform?

A.      Yes, we have standard business procedures.

Q.      And what are those?

A.      So if and when we identify any harmful content on the platform, if it is specifically child exploitation material, we -- A, it is flagged.  So depending on how we find it, we have automatic technology that scans for the material and flags it.

Once we are made aware of the content, a human on our trust and safety team, they are human content moderators, they review that content.  And then if they determine that hey, the content which they reviewed is indeed what we call child sexual

abuse material, also referred to as child pornography, if they confirm that's what it actually is, they will then deactivate the user's account where the content was found and then they will submit a CyberTip containing that content to the National Center for Missing and Exploited Children.

Q.    And is that a procedure that Yahoo routinely follows?

A.    Yes, absolutely.

Q.    And you talked about a trust.  Could you explain a little bit more of that division you talked about that would review --

A.    Sure.

Q.    -- human review?

A.    The trust and safety team.  So this is a group of human content moderators.  They review, again, any abusive material that is found on our platform.  Specifically as it relates to child sexual abuse material, they are trained in knowing what CSAM is or child pornography is.

When our automatic scanning technologies alert us and them that they have identified a Yahoo -- and I'm using the term Yahoo which encompasses all of the mail platforms that we host, which is also AOL and some other domains as well -- but any Yahoo mail that is sent, once an account is flagged for sending CSAM, the trust and safety team, they will, again, as I said, review that content to verify that it is indeed CSAM, make sure there are no false positives.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Once they confirm that the content is indeed CSAM, they then will start a review of all of the content in that user's entire account.  So the user may have sent one or two images which were flagged by our system.  Once those are flagged, once the content moderator has reviewed that content, they then will review all content in that user's account to determine whether or not there is additional CSAM.  And once they determine what CSAM is in the account, like I said, they will file the CyberTip.

When they file the CyberTip, they're looking at the content on a dedicated platform, you know, that is developed by our company and they're looking at the content.  They confirm that it is CSAM.  They hit a, basically, a submit button on the screen.  That then brings a summary page that shows all of the CSAM content.  So they're seeing it for a second time and verifying that this is indeed the CSAM content that they are submitting to NCMEC.  There is a box that is automatically checked on that page that says, you know, a human has reviewed this.  They then check another box that says I have reviewed this and the EXIF associated with these images or these videos. And then they have to manually hit a submit button to submit the CyberTip, the data that is contained in the CyberTip to NCMEC.

Q.        So the individuals you've talked about looking at the materials, the content moderator and the trust and safety team,

those are employees of Yahoo?

A.      Yes, they are.

Q.      And the procedures you described that all takes place within Yahoo?

A.      Correct.

Q.      Law enforcement is not involved?

A.      No.  This is standard operating procedure.

Q.      And prior to the CyberTip you talked about being submitted to the National Center of Missing and Exploited Children, is it reviewed by law enforcement for any of that action that's taking place?

A.      No.

Q.      This is all done within Yahoo?

A.      Correct.

Q.      And you indicated that this was standard procedure for Yahoo?

A.      Yes.

        MS. VIACAVA:  At this time, I would seek to publish Government's Exhibit No. 6 that's been admitted into evidence.

        BY MS. VIACAVA:

Q.      I'm now showing you Exhibit 6 that's been admitted into evidence.  Do you recognize Government's Exhibit No. 6?

A.      I do.  This is our transparency report.

Q.      And what is the purpose of a transparency report?

A.      It's to notify the public about what our actual

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

policies and procedures are in regards to our effort to combat child sexual abuse material so that that information is, again, made public.

Q.        And could you please read what's been highlighted on the screen?

A.        Sure.  "Yahoo prohibits child sexual abuse material under our terms of service and our community guidelines.  Yahoo operates a robust digital safety program designed to detect and remove CSAM from our platforms.  Yahoo's efforts are spearheaded by a dedicated trust and safety team."

Q.        And again, when you talk about CSAM, just for the record, you're referring to child sexual abuse material?

A.        That is correct.

Q.        And in this transparency report, does Yahoo provide how they identify this child sexual abuse material?

A.        We do.

Q.        Could you please read what's been highlighted on the screen?

A.        "Yahoo uses a combination of automated scanning and human review to detect CSAM as permitted by the law.  Yahoo uses photo DNA and CSAI match technologies which are capable of matching the digital signature of an uploaded image or video to large databases of known CSAM maintained by the National Center for Missing and Exploited Children."

          "Our team of expert human reviewers evaluate the

images detected through automatic scanning to ensure that all confirmed CSAM in an account is reported to NCMEC, and;"

"Finally, we carefully review and take action on abuse reports sent to us by users and by child safety organizations like NCMEC."

Q.      And in this transparency report, does it also provide what Yahoo does when it finds such material?

A.      It does.

Q.      So the procedures are made available to the public?

A.      Correct.

Q.      And this is available from Yahoo's website?

A.      Correct.  Yes.

Q.      And is this -- the transparency report, have these been done for many years?

A.      They have.

Q.      Okay.  And are they updated to provide information as to how many reports were made by Yahoo in a given year?

A.      They are.  I believe this one goes through 2021.

Q.      Okay.  Can you please read the highlighted portion of Government's Exhibit No. 6?

A.      "Yahoo reports all CSAM to NCMEC and includes subscriber information for the user who uploaded the CSAM which helps NCMEC identify the alleged offender.  NCMEC acts as a clearinghouse for U.S. law enforcement and sends reports for offenders located outside of the U.S. to partner agencies in

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

the relevant country."

"After Yahoo files reports with NCMEC, Yahoo's investigators identify particularly serious cases that warrant further investigation.  By leveraging internal data and open source information, Yahoo's investigators are often able to identify and locate offenders responsible for uploading CSAM to Yahoo's platforms.  Yahoo then transmits this information to NCMEC in the form of a supplemental report."

Q.        And in this particular Government's Exhibit No. 6, does it provide how many reports Yahoo made for 2021?

A.        It does.  So we reported, as it says here, in 2021, Yahoo reported 5,498 accounts to NCMEC for trafficking CSAM on our platforms and filed an additional 341 supplemental reports with NCMEC.

Q.        And this particular transparency report is available on the internet?

A.        That is correct.

Q.        It's made public?

A.        Yes.

MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 5A.

Q.        What is depicted in Government's Exhibit No. 5A?

A.        This is Verizon Media terms of service.

Q.        And in 2021, to your knowledge, was Verizon Media part of Yahoo?

A.        Yes.

Q.        Or with Yahoo?

A.        Yes.  At that time, Verizon Media owned -- well, Verizon Media was the name that Yahoo went by at that point in time because Verizon had purchased Yahoo.

Q.        In looking at the first line that's highlighted in Government's Exhibit No. 5A, does it provide such information?

A.        It does.

Q.        Can you please read what's indicated?

A.        In June 2017, we announced that Yahoo and AOL joined to become a unified digital and mobile media company as part of Verizon.  We are now operating under these unified terms of service.

Q.        Could you please read what's been highlighted?

A.        "By using the services, you agree to these terms, the policies in our privacy center, and any community guidelines and supplemental terms provided to you for the services that you use.  Collectively, terms."

Q.        And under the terms of service, does it particularly talk about member conduct?

A.        It does.

Q.        And under member conduct, could you please read the highlighted portion?

A.        "Member conduct.  You agree not to use the services to:

"One, obtain or attempt to obtain unauthorized access to the services or to our servers, systems, networks or data."

"Two, make available any content that is harmful to children, threatening, abusive, harassing, tortuous, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful or racially, ethnically or otherwise objectionable."

"Three, violate any applicable laws or regulations."

Q.    And these are the terms of service that are given to every subscriber?

A.    Correct.

Q.    And that is what they're held accountable for?

A.    That is correct.

Q.    And these are the terms of service that were in operation in 2021?

A.    That is correct.

MS. VIACAVA:  At this time, I would publish Government's Exhibit No. 5B that's been admitted into evidence.

Q.    What is depicted in Government's Exhibit No. 5B?

A.    This is Yahoo terms of service.

Q.    So in addition to, essentially, the parent company, Yahoo also had terms of service?

A.    This is correct.

Q.    And are they similar?

A.    They are almost identical.

Q.          Okay.  Can you please read the highlighted portion?

A.          "In June 2017, we announced that Yahoo and AOL joined to become a unified digital and mobile media company.  We are now operating under these unified Yahoo terms of service."

Q.          Can you please read the highlighted sentence?

A.          "By using the services, you agree to these terms, the policies in our privacy center, and any community guidelines and supplemental terms provided to you for the services that you use.  Collectively, terms."

Q.          And does the Yahoo terms of service also have a section regarding member conduct?

A.          It does.

Q.          Can you please read what's been highlighted in Government's Exhibit No. 5B?

A.          "Member conduct.  You agree not to use the services in any manner that violates these terms on our community guidelines, including to:"

            "Making available any content that is harmful to children, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful or racially, ethnically or otherwise objectionable."

            "Or violate any applicable laws or regulations."

Q.          So, to make clear, regardless of which terms of service a subscriber may look at, whether it be the parent

company under Verizon or look under the Yahoo, it provides the same information as to what members are not allowed to do?

A.    That's correct.

Q.    In preparing to come to court today, did you have an occasion to review CyberTips that were provided from Yahoo to the National Center of Missing and Exploited Children relevant to today's hearing?

A.    I did.

MS. VIACAVA:  Your Honor, at this time, the government would seek to publish Government's Exhibit No. 1A that's been admitted into evidence.

Q.    In Government's Exhibit No. 1A, was Yahoo the company that submitted the NCMEC report?

A.    Yes.

Q.    And did Yahoo provide the information as to what type of incident Yahoo was reporting?

A.    We did.

Q.    And specifically looking at the highlighted portion, what was the incident type reported?

A.    Child pornography possession, manufacture, and distribution.

Q.    And what was the date of the incident?

A.    April 5th -- sorry, excuse me.  April 15, 2021.

Q.    And what is indicated under the description of the incident time?

A.        This is the date and time when Oath, which was the former name of Yahoo, submitted the CyberTip to NCMEC.

Q.        And looking at the report, does it indicate that information about emails was provided to National Center for Missing and Exploited Children?

A.        Yes.

Q.        And provide date sent and to you?

A.        It does.

Q.        And did it also provide -- in the CyberTip with the information about the emails, did it also provide a copy of the attachment?

A.        It would provide information related to the file attachments, yes.

Q.        And in this particular report, Government's Exhibit No. 1A, were there files uploaded?

A.        Yes, the CyberTip indicates that there were six.

Q.        And this is the information that was provided in the Yahoo -- in the tip that Yahoo made to National Center for Missing and Exploited Children?

A.        Yes.

Q.        And did Yahoo provide information as to each of those six files?

A.        Yes.

Q.        And did Yahoo go through and provide information such as the filename?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.        Yes.

Q.        Did it provide the hash value for the file?

A.        Yes.

Q.        Did it provide -- and let's go back.

When we talk about the MD5 or the hash value, what does that mean?  What is a hash value?

A.        It's, essentially, a unique digital signature or fingerprint.

Q.        So meaning if two files had the same hash value, they're the same file?

A.        Correct.

Q.        And did Yahoo answer some questions for NCMEC such as the original filename associated with the file or did the reporting ESP view the entire contents of the uploaded file?

A.        Yes.

Q.        And when asked the question about did reporting ESP view entire contents of uploaded file, how did Yahoo respond?

A.        Yes, we had.

Q.        And reviewing the files before the tip is made is standard procedure for Yahoo?

A.        Yes, it is.

Q.        Even if a file might be flagged based on a hash value or a match that's made through the computer, before a CyberTip is made, generally, or standard procedure with Yahoo, is it reviewed by a human?

A.        Always.

MR. DAVIDOW:  Objection to form.

THE COURT:  Sustained.  Go ahead and let her answer that, but go ahead.

BY MS. VIACAVA:

Q.        You can answer the question.

A.        Yes, the files are always reviewed by a human.

Q.        Okay.  And in this instance, the image that is indicated by the filename, is there a categorization given by the ESP by Yahoo?

A.        There is.

Q.        And what was designation?

A.        In this instance, it is A1.

Q.        And by making the designation of A1, what information is Yahoo conveying regarding the file?

A.        That the individual depicted in the file is a prepubescent minor engaged in a sex act.

Q.        In looking through each of the six files, for the second file, is it the same information?  Was the same procedure followed, meaning was the file viewed in its entirety?

A.        Yes, it was.

Q.        And was it also given a categorization for that file?

A.        Yes, it was.

Q.        And what was the categorization?

A.        A1.

Q.        So another image of a prepubescent minor engaged in a sex act?

A.        Correct.

Q.        For the third file, did it provide the same information?

A.        It appears that it does.

Q.        File was viewed in its entirety?

A.        Yes, it was.

Q.        And it was given a categorization of A1?

A.        Yes.

Q.        The fourth file, was it the same situation?

A.        It appears that it was, yes.

Q.        The entire file was viewed and the contents of the uploaded file was viewed in its entire contents?

A.        Yes, it was.

Q.        By Yahoo?

A.        Yes, by a human at Yahoo.

Q.        And this was done prior to the report being made?

A.        Correct.

Q.        And was there a categorization to this particular file?

A.        A1.

Q.        So all six files reported were A1 and viewed in its entirety?

A.          Yes.

Q.          In addition to providing the information about the file and the categorization, as part of the CyberTip, does Yahoo also provide what information it has regarding the subscriber?

A.          It does.

Q.          So in Government's Exhibit No. 1A, does it provide the name for the suspect?

A.          It does.

Q.          What is indicated?

A.          Here, the name is Richard and his last name B-R-I.

Q.          And is that information that Yahoo obtained from the subscriber when they signed up for the account?

A.          Yes, it is.

Q.          And is that information verified?

A.          The name is provided by the user.  It is not necessarily verified.

Q.          So Yahoo just provides the information that you have?

A.          Correct.

Q.          And in addition, does Yahoo provide other information such as mobile telephone number?

A.          Yes.

Q.          And looking at Government's Exhibit No. 1A, is a number provided?

A.          Yes, it is.

Q.          Next to it, it indicates verified.  What is that referring to?

A.          That indicates that the user or the individual with access to that account did verify that that phone number is linked to that account.

Q.          So there had been some kind of contact by Yahoo with that number?

A.          Correct.

Q.          And it provides the date that happened?

A.          Correct.

Q.          In the CyberTip, did it also provide the date of birth, email address, as well as IP addresses that Yahoo had for this subscriber?

A.          It does.

Q.          And here, what is the email address that is associated with the account that had the child exploitation material?

A.          Jobs4rich@yahoo.com.

            MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 1B.  And, Your Honor, may I approach with the exhibit?

            THE COURT:  Yes, you may.

            BY MS. VIACAVA:

Q.          Is Government's Exhibit No. 1B another CyberTip that Yahoo made --

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.        Yes.

Q.        -- to the National Center for Missing and Exploited Children?

A.        Yes, it is.

Q.        And in the CyberTip, what's been highlighted on the screen, does it provide you with the incident type that was recorded by Yahoo to the National Center for Missing and Exploited Children?

A.        It does.  It identifies child pornography.

Q.        And does it provide the incident time and date?

A.        It does.  In this instance, it is May 12, 2021.

Q.        And that's the date and time that Yahoo submitted the tip to NCMEC?

A.        Yes.

Q.        And in this particular file, does it provide information about emails that were sent on the Yahoo platform?

A.        Yes.

Q.        It provides the date sent, from and to?

A.        It does.

Q.        And in this particular -- in Government's Exhibit No. 1B, does it provide information as to multiple emails where either the subscriber received emails that contained child exploitation materials or sent materials that contained child exploitation materials?

A.        Yes, it provides that information.  Generally, this

would be sent.  We only flag content when it is sent.

Q.        Okay.  And in this instance, does it provide information as to how many files the report is referencing?

A.        It does.  In this instance, it says 217 files.

Q.        So 217 as to this particular CyberTip involving a particular subscriber that contained child exploitation material?

A.        That is correct.

Q.        And did Yahoo provide subscriber information?

A.        We did.

Q.        What was the suspect name that was provided?

A.        Reb Reb.

Q.        And again, that was the name that would have been provided by the subscriber to Yahoo?

A.        Correct, upon the registration of the account.

Q.        And does it provide the mobile phone number?

A.        It does.

Q.        And does it indicate whether that phone number has been verified?

A.        It does.  It was in this case.

Q.        And does it provide the date of birth that had been provided by the subscriber?

A.        Yes, it does.

Q.        And what is the email address that this particular CyberTip is referencing?

A.          Reb3280@yahoo.com.

Q.          And does it also provide the IP addresses that were captured by Yahoo, either through registration log-ins or other times?

A.          It does.

Q.          So looking at the first file that's referenced that's blown up on the screen, did the Yahoo provide the filename as well as the hash value for the file?

A.          It did.

Q.          And did Yahoo indicate whether or not the entire contents of the uploaded file had been viewed by an employee of Yahoo?

A.          It did.  It indicated yes, it had been.

Q.          And looking at what's blown up on the screen, is this yet another file of the 217 in which Yahoo provided information as to whether or not they had looked at the entire contents of the file?

A.          It is.

Q.          And what was Yahoo's response?

A.          That Yahoo, the ESP, did indeed view the entire contents of the uploaded file.

Q.          You have in front of you Government's Exhibit No. 1B, the entire CyberTip report.  Looking in section A, can you just flip through and see if, on all 217 files, if Yahoo indicated that they had viewed each and every one of those files.

(Pause.)

A.          It appears that yes, yes.

Q.          So looking at Government's Exhibit No. 1B, from, essentially, page 11 to page 63, it references all 217 of those files?

A.          Yes.

Q.          In looking through those pages, every information provided for each of those uploaded files indicates they had been viewed in its entirety?

A.          Yes.

Q.          And that would have been done prior to the CyberTip being made?

A.          Correct.

Q.          And that would have been done without any involvement with law enforcement?

A.          Correct.

Q.          And it was done without any direction of law enforcement?

A.          Correct.

Q.          Now, looking at the section that's been blown up on page 10 of the CyberTip, Government's Exhibit No. 1B, does it provide information as to where the files were found?

A.          It provides the email, the date and time, obviously, the filenames, et cetera.

Q.          So from here, it indicates the subscriber that's

reported in the CyberTip sent the email to another individual?

A.      It does.

Q.      And what was the date?

A.      The date appears to be Monday, May 10, 2021.

Q.      That's when the email would have been sent from the email reb3280@yahoo.com to an individual with another Yahoo account?

A.      Correct.

Q.      And the attachments with that email, some of those were part of the 217 files that were --

A.      Correct.

Q.      -- referenced?

        At the section highlighted above, is this another email that the subscriber using the Yahoo account of reb3280@yahoo.com sent to another user with a Yahoo address?

A.      It is.

Q.      And what was the date on this one?

A.      Monday, May 10, 2021.

Q.      And does it also reference the attachments?

A.      It does.

Q.      And those attachments would have been part of the images that were reported of the 217?

A.      Correct.

        MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 1C that's been admitted

into evidence.

Q.        Is this another -- a third CyberTip that was submitted by Yahoo to National Center for Missing and Exploited Children?

A.        It is.

Q.        And what was the date that this CyberTip was made from Yahoo to National Center for Missing and Exploited Children?

A.        May 17, 2021.

Q.        And does this CyberTip include information regarding an email that was sent from a subscriber to another individual that contained child exploitation material?

A.        It does.

Q.        What was the date that the email was sent?

A.        Saturday, May 15, 2021.

Q.        And what was the email address of the Yahoo subscriber?

A.        Reb3280e@yahoo.com.

Q.        And looking at this particular CyberTip, does it contain several emails --

A.        Yes.

Q.        -- that contained child exploitation material?

A.        It does.

Q.        And in this particular CyberTip, how many files were reported or uploaded from Yahoo to the National Center for

Missing and Exploited Children?

A.        Ten.

Q.        In looking at this particular report, does it provide information as to the filename?

A.        It does.

Q.        Does it provide the hash value?

A.        It does.

Q.        Does it indicate whether or not the Yahoo -- a member of Yahoo looked at the entire contents of the file?

A.        It does.  It indicates yes.

Q.        And does it provide information as to the categorization of the file?

A.        It does.  A1.

            MS. VIACAVA:  May I approach the witness, Your Honor?

            THE COURT:  Yes, you may.

            BY MS. VIACAVA:

Q.        In looking at the information provided by Yahoo regarding those ten files to National Center for Missing and Exploited Children, did Yahoo indicate that they had looked at each and every one of those files before making that CyberTip?

A.        Yes.

Q.        And did Yahoo also provide the subscriber information that you had for that particular email address?

A.        Yes.

Q.        What was the name that the subscriber used?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.        Reb Reb.

Q.        And did it provide a mobile phone number?

A.        It did.

Q.        And does it indicate whether or not that number was verified by Yahoo?

A.        It does.  It indicates that it was verified on May 13, 2021.

Q.        And does it provide the date of birth as well as the email address?

A.        It does.

Q.        And what is the email address for the subscriber for this particular CyberTip?

A.        Reb3280e@yahoo.com.

Q.        Okay.  And does it also provide the IP addresses that were captured?

A.        It does.

          MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 1D that's been admitted into evidence.

Q.        Is this a fourth CyberTip that was made by Yahoo to the National Center for Missing and Exploited Children?

A.        It is.

Q.        And what was the date and time that Yahoo made the CyberTip to the National Center for Missing and Exploited Children?

A.      May 19, 2021.

Q.      So just days after the last?

A.      Correct.

Q.      And what was the incident type that was recorded?

A.      Child pornography.

Q.      And that was the same incident type as to all four CyberTip reports that were discussed this morning?

A.      Correct.

Q.      And does it provide information as to the subscriber sending emails with attachments that contained child exploitation material to other users?

A.      Yes, it provides the date and the email address from which the content was sent.

Q.      And what was the date reported?

A.      In this instance, Tuesday, May 18, 2021.

Q.      And it was sent from the subscriber Reb Reb?

A.      Correct.

Q.      And what was the email address that was used?

A.      Yngluv01@yahoo.com.

Q.      And there was more than one email sent on May 18, 2021, that contained child exploitation materials by the same subscriber?

A.      Yes.

Q.      And was subscriber information provided in the CyberTip?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.      Yes.

Q.      What was the name provided by the subscriber to Yahoo for this particular account?

A.      Reb Reb.

Q.      And did it provide a mobile phone number?

A.      It did.

Q.      And was that mobile phone number verified?

A.      It was, on May 17, 2021.

Q.      And looking -- I believe you have in front of you -- you have Government's Exhibit No. 1C as well?

A.      Yes.

Q.      Looking at that, is that the same subscriber name as well as the same verified phone number as to both CyberTips?

A.      I believe it is.  Yes, it is.

Q.      So the email address has changed, but the subscriber name and the verified mobile phone number stayed the same?

A.      That's correct.

Q.      And in this CyberTip that's contained in Government's Exhibit No. 1D, did it also provide the IP addresses that were captured?

A.      Yes.

Q.      When Yahoo makes these CyberTips on a particular subscriber's account, does Yahoo take any other action?  Do they allow the account to remain or do they shut it down?

A.      No, prior to the CyberTip actually being submitted,

the member of the trust and safety team deactivates the user's account, which means that it is no longer accessible to the user.

Q.    Okay.  But it does -- there's nothing that would prevent the user from opening up another account?

A.    Correct.

Q.    In a different name?  Or a different email?

A.    Correct.

Q.    But they would not be able to use the same email that's been shut down?

A.    Correct.

Q.    So in this particular CyberTip, Government's Exhibit No. 1D, how many files were uploaded in this CyberTip?

A.    Eight.

Q.    And looking at the first file that was reported, does it provide the filename as well as the hash value?

A.    It does.

Q.    And does it indicate whether or not an individual from Yahoo or employee of Yahoo looked at the entire contents of the uploaded file?

A.    It does.  It indicates yes.

Q.    And does it provide a categorization as to the file?

A.    Yes.  In this instance, A1.

Q.    And A1 stands for?

A.    Prepubescent minor engaged in a sex act.

MS. VIACAVA:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

BY MS. VIACAVA:

Q.    Looking at Government's Exhibit No. 1D, from the eight files that Yahoo reported and uploaded, does it indicate whether or not Yahoo looked at the entire contents of each one of those files?

A.    Yes, it indicates that Yahoo looked at all of the files.

Q.    And does it also provide a categorization for each of those files?

A.    Yes.

Q.    For seven of the eight?

A.    Seven of the eight, yeah.

Q.    For seven of the eight, does it provide a categorization?

A.    Yes, it does.

Q.    And what categorization is provided?

A.    The categorization is A1.

Q.    And it indicates all eight files were reviewed in its entire contents?

A.    I see seven here.  But it indicates all files indicated on this CyberTip were reviewed by a human before the contents were submitted to NCMEC.

Q.    Hold on.  I'm sorry, something popped up on the

screen.  Let me -- okay.

Well, looking at the report, looking at this particular page, it indicates two of the files and at the bottom is a third; correct?

A.      Correct.

Q.      And then that third file is continued on onto the next page; correct?

A.      Correct.

Q.      And you have five, six, and seven that's referenced?

A.      Correct.

Q.      And then on the last page, it provides the information as to the other?

A.      Yes.

Q.      So all eight files indicate they've been looked at in its entirety?

A.      Yes.

Q.      In this particular instance, in addition to the four CyberTips that were made, did Yahoo have an occasion to make supplemental reports in this instance?

A.      Yes.

Q.      And what is the purpose of supplemental reports, in general?

A.      Essentially, two.  One, reconfirm that the content was indeed CSAM through another human review.  Two, to provide additional identifying information on the believed subscriber

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

so that there is more identifying information provided to NCMEC. In this instance -- in the instance that the team can identify the user as a registered sex offender, then a supplemental report will be written.

Q.      And during this particular time, is this -- the supplemental report, is this something that's prepared within Yahoo and at Yahoo's procedures?

A.      Yes.

Q.      This was not done at the direction of law enforcement?

A.      No.

Q.      Had you had any -- or had Yahoo had any contact with law enforcement in terms of gathering this information?

A.      No.

Q.      Were you yourself involved in any of the supplemental reports?

A.      I was.  In one.

Q.      Okay.  And what was the purpose of you preparing the supplemental report in this particular instance?

A.      After my review of four of the CyberTips and my investigation into who I believed the user to be, I identified the individual as an alleged registered sex offender.

        MS. VIACAVA:  And at this time, the government would seek to publish Government's Exhibit No. 2A.

Q.      Was this the particular supplemental report that you

were involved with?

A.       I don't think that one was.  I believe that was the first one.

Q.       Okay.  So, looking at Government's Exhibit No. 2A, this is the first CyberTip supplemental report that was made?

A.       Correct.

Q.       Okay.  And this was provided from Yahoo to the National Center of Missing and Exploited Children?

A.       Correct.

Q.       And when was this supplemental report provided to the National Center for Missing and Exploited Children?

A.       April 23, 2021.

Q.       So this was done shortly after the first CyberTip?

A.       Correct.

Q.       And did Yahoo provide information regarding an escalation or what they believed to be an escalation?

A.       Yes, it did.

Q.       What was provided?

A.       In this instance, the escalation factor is written as the user appears to be a registered sex offender in Florida for a prior sex crime conviction involving a child committed in Michigan.

Q.       And in this particular supplemental report, did Yahoo provide information regarding the phone number, when it was verified, and information such as that regarding the account?

A.        Yes.

Q.        And in this particular instance, Yahoo reported -- when did Yahoo report the phone number had been verified?

A.        On January 21, 2021.

Q.        And did it provide further information as to who they believed the individual to be in terms of subscriber and where that subscriber resided?

A.        It did.  We provided log-in information for IPs as well as information on what we call non-reported images.

Q.        And below, the last sentence, when it refers to open source information, what is referenced?  What is meant by that?

A.        That would be publicly available data that investigators use to identify information on users.

Q.        And was that information provided then to the National Center for Missing and Exploited Children?

A.        It was.

Q.        And it provided such information as name, date of birth, address, as well as emails associated?

A.        Correct.

Q.        And in this case, did it also provide that he was believed to be a registered sex offender?

A.        Yes.

Q.        And does it provide the source of the information?

A.        It does.

Q.        Does it indicate that the sex offender registry had

been viewed?

A.        It does.

Q.        And in this CyberTip, did it provide information regarding available information, conviction date, things of that nature?

A.        Yes.

Q.        And that was all information that was then provided in this supplemental CyberTip?

A.        That is correct.

Q.        And this was information that was gathered by Yahoo and provided?

A.        Yes.

Q.        And in this particular supplemental report, did Yahoo also include other identifiers that it came across?

A.        Yes.  As is standard business procedure, any time an investigator writes a supplemental report, at the bottom or on the last page, we include any identifiers that we have found in reference to this specific report so that NCMEC may use those identifiers to search their own databases.

Q.        And so, here, the email address, phone numbers, and IP addresses as well as various names --

A.        Correct.

Q.        -- were provided?

A.        Yes.

Q.        In addition, did Yahoo provide information regarding

the individual possibly being registered by the sex offender -- as a sex offender?

A.      We provided information on -- the subscriber information on the user as well as the information we obtained through the open source investigation.

Q.      Okay.

MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 2B that's been admitted into evidence.

Q.      Is this a supplemental report that you were involved with?

A.      Yes.

Q.      Okay.  And this would be the second supplemental report?

A.      That's correct.

Q.      And when was the supplemental report submitted to the National Center for Missing and Exploited Children?

A.      May 25, 2021.

Q.      And what is indicated in terms of the ESP escalation?

A.      The user appears to be a registered sex offender in the State of Florida and to have been recently released from federal prison following a 240-month sentence for the sexual exploitation of minors.

Q.      Does it also reference other CyberTip report numbers?

A.      It does.  Three of them.

Q.      And again, this was information contained in this report was found by Yahoo?

A.      Correct.

Q.      Was it done at law enforcement's direction?

A.      No.

Q.      And in this particular report, did it indicate that -- did it reference the other CyberTips?

A.      It did.

Q.      And does it provide various Yahoo emails that Yahoo was indicating believes to be linked to the same subscriber?

A.      It does.

Q.      And so looking at the last paragraph that's highlighted there, can you please read that particular sentence?

A.      "The Yahoo accounts reb3280@yahoo.com, reb3280e@yahoo.com, and yngluv01@yahoo.com were reported for sharing CSAI using Yahoo mail, as observed in CyberTips."

Q.      And it provides three CyberTips?

A.      Three CyberTip numbers respectively.

        "As described further below, these accounts utilize the phone number 1-239-667-1643 and, therefore, appear to be used by the same individual."

Q.      Okay.

A.      Do you want me --

Q.      So from your perspective in looking at this

particular matter, it appeared to be the same user?

A.       That's correct.

Q.       And you provided the information that you had to National Center for Missing and Exploited Children in the supplemental report?

A.       Yes.

Q.       Was this an attempt to link the tips together?

A.       Yes.

Q.       And at the end of your supplemental report, did you provide the various emails, IP addresses, phone number, as well as names associated with the account?

A.       Yes.

Q.       And did you upload a file along with the CyberTip?

A.       Yes, the CyberTip file.

Q.       Okay.

         MS. VIACAVA:  At this time, the government would seek to publish Government's Exhibit No. 8 that's been admitted into evidence.

Q.       In preparation for coming to court today, did you have an occasion to provide a declaration?

A.       I did.

Q.       And the information you've testified to today, is that consistent with what you provided in your declaration explaining the process of Yahoo and your involvement in this particular case?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.    Yes.

Q.    And in your declaration, in the first sentence, do you indicate which CyberTips you reviewed --

A.    Yes.

Q.    -- yourself?  And do you indicate information regarding your supplemental report?

A.    Yes.

Q.    Now, in this particular case, are you --

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 4A that's been admitted into evidence.

Q.    Are you aware that Yahoo was served with a search warrant for various email accounts associated with the CyberTips?

A.    Yes.

Q.    In looking at the email accounts listed in attachment A to Government's Exhibit No. 4A, are those the email accounts associated with the CyberTips that you discussed today?

A.    Yes.

Q.    What is the date that's listed on the search warrant?

A.    September 1, 2021.

Q.    To your knowledge, was it only after a search warrant was served that Yahoo provided any additional information and content to the accounts to law enforcement?

A.    To my knowledge, yes.

Q.        When the CyberTip was made -- the four CyberTips and the two supplemental reports, was that conduct that was or was that activity and based on actions of Yahoo and Yahoo alone?

A.        Yes.

Q.        There was no involvement with law enforcement at that time?

A.        No.

          MS. VIACAVA:  May I have one moment, please, Your Honor?

          THE COURT:  You may.

          (Pause.)

          MS. VIACAVA:  No further questions for this witness, Your Honor.

          THE COURT:  Cross-examination, Mr. Davidow.

          MR. DAVIDOW:  Thank you, Your Honor.

     CROSS-EXAMINATION ON BEHALF OF THE DEFENSE

BY MR. DAVIDOW:

Q.        Good morning, Ms. Kramer.

A.        Good morning.

Q.        I'm not as technologically advanced, but I'm going to just use the Elmo, if we can.

          THE COURT:  Go ahead.

Q.        Recalling Government's Exhibit 6.  Okay.

          In looking at Exhibit 6, you recall that you had gone over this exhibit with the government?

A.          Yes.

Q.          Now, here it states on, this Exhibit 6A, if we're looking in about the middle of the page, "Yahoo uses a combination of automated scanning and human review to detect CSAM as permitted by the law."

            When you say permitted by the law there, is there somebody that's reviewing that it's in compliance with certain laws?

A.          We have, yeah, in-house lawyers and policy personnel.

Q.          And so then those policy personnel assist with what they would determine to be compliance with, let's say, the constitution of the United States?

A.          Well, I would imagine that it would be the lawyers, but I am not one so.

Q.          Now, it says here automated scanning.  What is that?

A.          So those are technologies such as photo DNA and CSAI match developed for the purpose of, as we were talking about earlier, identifying hash matches to known CSAM material.

Q.          And so let's dumb this down a little bit.  It's a program; is that fair to say?

A.          Sure.  It's a technology.

Q.          So you can just click it and it runs?

A.          It runs, yeah, automatically.

Q.          And it keeps running all the time?

A.          It runs all -- on any sent emails.

Q.        And so no one has to turn it on; correct?

A.        No.  I mean, it had to be employed originally, yes.

Q.        All right.  But for it to search any one thing, no human has to actually interact with it after its employment?

A.        Correct.

Q.        Is that fair?  Sorry.

A.        Correct.

Q.        Okay.  I know it's a little odd that we may be talking, but there's a record being made.

A.        Yeah, yeah.

Q.        So sometimes it may seem very conversational, but we have to make sure we don't talk over one another.

So this runs now for any, let's call it, email account for anyone at Yahoo; is that fair?

A.        Not exactly.

Q.        Okay.  So then what doesn't it search?

A.        So it searches -- right -- for that known -- the hashes for known CSAM content.  So it runs and it will only identify a match if an individual is sending that content.

Q.        And so how does this program know what those hashes are?

A.        We are continually updated from NCMEC with hash -- their hash libraries of known CSAM content.

Q.        And so let's say at the time that one of these, let's call them, hash matches shows up, this has been something

that's been floating around the internet; is that fair to say?

A.      Yes.

Q.      And continues to float around the internet; is that fair to say?

A.      I would say is sent around the internet, yes.

Q.      And so, in essence, this automated system then really doesn't need to do anything other than match up, let's say, 1s and 0s?  Is that kind of in layman's terms?

A.      To identify the match, yes.

Q.      And is that both the photo DNA and the CSAI match technology, is that the same thing or is there other technologies?

A.      They're similar.  One is for images and one is for videos.

Q.      Okay.  But they do the same thing?

A.      In layman's term, yes.

Q.      Are there other, let's call them, automated technologies that are employed and that function without, let's call it, human interaction after their employment?

A.      In regard?

Q.      That Yahoo uses to combat -- let's use the frontline here -- child sexual abuse material?

A.      No, those are the two primary technologies we use.

Q.      So words like primary?

A.      Those are the technologies we use to automatically

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

scan.

Q.      Okay.  Now, you had stated or they were identified -- there was this -- a dedicated trust and safety team.  Are you a member of trust and safety team?

A.      No.

Q.      Were you ever a member of the trust and safety team?

A.      No.

Q.      Do you know how many members of the trust and safety team there are?

A.      There are currently approximately six, I believe.

Q.      There's six members of the trust and safety team?

A.      I believe so.

Q.      And let's just take some numbers here.

In 2021, Yahoo reported 5,498 accounts to NCMEC.  So then six people is what you're saying from the trust and safety team would have been responsible for that?

A.      Correct.

Q.      All right.  And are the names and addresses and, let's call them, dates of birth to identify the trust and safety team maintained somewhere at Yahoo?

A.      I would imagine.

Q.      So -- and, I guess, walk me through this.

This program is functioning whatever these automated programs are functioning.  And then they find out they make a match, correct, like, somehow with known material that's,

basically, floating around the internet.  So there's known material.  And then somehow these programs create some form of alert at Yahoo?

A.        Correct.

Q.        And the alert is created without any human intervention?

A.        Correct.

Q.        And how does that alert then get processed?

A.        So, essentially, we have an internal tool where once an account is -- we call flagged for having sent CSAM, so that match, that automatic scanning happens, the account is flagged for sending CSAM.  Then in that tool that we have, that trust and safety team will go into the tool and they will review each and every account that was flagged for CSAM to, again, verify whether or not it is, indeed, CSAM.

Q.        Okay.  So -- and let's -- let me work that out.

So now there's one tool.  Well, you said tool.  Is a tool another automated program?

A.        It's automated to a degree, but it involves human interaction.

Q.        So the first program identifies something.  Then it sends it to a second program that creates what you're saying is some form of human interaction window; is that fair to say?

A.        Yes.

Q.        And is there a way to track what human actually

interacts with that window?

A.    Yes.

Q.    And how is that tracked?

A.    Essentially, within the tool itself, it will identify which trust and safety individual reviewed which -- what we call an archive, so an account, and it will review -- it will say which trust and safety individual reviewed that and when they reviewed it.

Q.    And is that information ever submitted to NCMEC?

A.    You mean the name of the reviewer?

Q.    Well, the information of when they got the flag, how they got the flag, all of the information that would be stored through this secondary program that we just identified as the automated flagging.

A.    No.

Q.    So none of that's sent to NCMEC?

A.    Not to my knowledge.

Q.    Is that stored somewhere?

A.    Yes.

Q.    Where is that stored?

A.    Inside that tool.

Q.    And tool meaning other program?

A.    Correct.

Q.    And does that program have to be turned on or off?

A.    It's always on.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        And it runs automatically?

A.        Well, again, the flagging runs automatically and that flagging provides the information into the tool so that the trust and safety individual can review the CSAM content in a dedicated platform where it's safe for them to review it.  But that, like I said, does involve human interaction.

Q.        And have you ever done that?

A.        I work in the tool for my own reviews, but separately from the trust and safety team.

Q.        So we have possibly six individuals that have access to this tool or is there more?

A.        There are more.

Q.        And do you have any idea how many individuals have access to this tool?

A.        I don't know the --

Q.        I'm not --

A.        Yeah.

Q.        Just round numbers.

A.        Probably less than 15.

Q.        And can the other individuals manipulate what had occurred with the original individuals that reviewed this tool?

A.        No.

Q.        Why not?

A.        Essentially -- so I know that my team of investigators, of which there are six of us, reviews content

within this tool.  All I can see is what the trust and safety individual has reviewed and I can see the content.  So the actual CSAM.  I cannot actually change any of the information that's in there.  I can just review it.

Q.        Is the other, let's call it, 15, not this other six, is their information stored and logged as -- when they go into this tool?

A.        So the six are part of the 15 that I was round numbers to.  So for engineers, probably.  I'm not an engineer; so I'm not sure.

Q.        Is there admin access to this tool?

A.        That's what I would be referring to as the engineers.

Q.        And meaning that sometimes, has there been an occasion where you've had an issue with the tool functioning?  Have you had to go to tech services for the software ever?

A.        I mean, not me personally, but I would imagine, if there are issues, the engineers handle it themselves.  That's not something I'm a part of.

Q.        Now, give me a second here.

          (Pause.)

          BY MR. DAVIDOW:

Q.        As you were going through -- and I'll pull one up here in a minute -- you had stated that -- I guess we hadn't really identified in the direct that there's a secondary program, but this secondary program, I think that's what you

stated was developed by our company was the words you used, content developed by our company; is that fair?  That's what we were talking about?

A.        You mean the tool --

Q.        Yes.

A.        -- where we would review this?  Yes.

Q.        Okay.  And then you stated that there's a box that automatically gets checked?

A.        Yes.

Q.        What box is that?

A.        So there is a box that comes up when the trust and safety individual has finished their review and it shows every piece of content that is about to be submitted and it says that a human has reviewed this content.

Q.        And that's automatically checked?

A.        That is automatically checked in the next --

Q.        Do you know why that's automatically checked?

A.        Because it's not possible to get to that summary page without having conducted a review and submitting -- like, essentially, a human saying hey, I have reviewed this and getting to the next page.

Q.        I mean, theoretically, you have a bot that's constantly scanning the internet for hash tag values.  It's not impossible that a bot could also automatically check something, is it not?

MS. VIACAVA: Your Honor, calls for speculation. Objection.

THE COURT: I'm not sure there was a question either, but sustained.

BY MR. DAVIDOW:

Q.     The bot scans the internet; correct?

A.     The program scans.

Q.     The program.  I'm calling it a bot.  Can a program scroll a page?

A.     Probably.

Q.     And so when you say that there's human interaction for this, is it something like a DocuSign where you got to scroll to the bottom of the page to reveal the checkmark to click on?  Is it something like that?

A.     I don't know that I would equate it to a DocuSign, but yes, you have to physically -- you have to actually see the content on the first page to actually get to the second page, which, again, is a summary display of all of the content, again.  And then you have to physically submit that content to actually get a CyberTip submitted.

Q.     And a program could do that?

MS. VIACAVA: Objection.  Asked and answered.  She's indicated human contact.  She's explained the process.

THE COURT: Overruled.

Go ahead, you can answer.

THE WITNESS:  I am not an engineer.  I mean, lots of things are technologically possible.  It could be.  Again, that's not the process we employ.

BY MR. DAVIDOW:

Q.        Now, if I go back here to this 6, it says "Yahoo operates," Exhibit 6, "a robust digital safety program designed to detect and remove CSAM from our platforms."

When you say remove, you mean delete the content?

A.        Delete the account that is sending the content.

Q.        And then that content, where does that content go?

A.        Well, it gets sent to the National Center for Missing and Exploited Children and then it usually gets preserved.

Q.        And Yahoo has some type of preservation area for that content?

A.        Yes.

Q.        And is that, to your knowledge, is that content accessible through the internet?

A.        No.

Q.        And when you say no, you mean it's under some form of password protection or offsite location?

A.        Yeah, it is securely -- essentially, you have to have credentials, log-in credentials, and authentication in order to access that data.

Q.        So when you say log-in credentials to access that data, is it physically possible to access that data from an

offsite location?

A.      If you were a hacker, maybe.

Q.      So you don't actually have to be within the same secured facility to access that information that's then removed?

A.      Right.

Q.      Now, you can remove the data and move the data to a different location.  Can you put data into an account?

A.      I'm not sure what you mean can I put data into an account.

Q.      Certainly.  If this program has the ability to delete -- right -- can it create?

MS. VIACAVA:  Your Honor, the government would have to, at this point, object to relevance.  We're here for a suppression hearing regarding what took place.  He's going well beyond the direct and the nature of this particular motion.

THE COURT:  Mr. Davidow?

MR. DAVIDOW:  Certainly, and this is -- we're going through a lot.  It's going to come down to a very finite set of facts.  And so, essentially, I am laying the record necessary to argue the position about what's a rather finite set of facts.  So there is, let's call it, a lot to go through, but the point is for the argument to be the argument necessary to make as it would relate to what I consider to be somewhat of a robust digital automatic programming that does various research

and surveillance things.  I think it's important that we have a full set of understanding of what it is.

THE COURT:  I'm going to overrule the objection.  You can ask that question.

BY MR. DAVIDOW:

Q.        If it has the ability to remove, Yahoo?

A.        We don't -- so we deactivate the account -- right -- that was sending the CSAM.  We then maintain the data -- right -- internally.  So we're not removing it.  We're removing it in the sense that the account can no longer be accessed and used to send that data, but the data still exists internally.

Q.        And so I guess what I'm saying is you have the ability to deactivate an account; you have the ability to take whatever that data was and move it to a secured location; you have ability to move data.  Do you have the ability to move data somewhere else, to add data to another account or location?  I'm just saying is that physically possible within this realm of the -- call it the Yahoo internet space?

A.        I mean, in an unauthorized access fashion, sure.

Q.        We had just reviewed this Exhibit 1A, Government's, recalling 1A.  This was, I guess, received by NCMEC on April 15th; is that fair from the report?

A.        Yes.

Q.        So it would have been sent -- I guess we have it in here -- on or around that date?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.        Correct.

Q.        All right.  Let's see here.

On this NCMEC report -- I kind of jumped over it.  It says here submitter.  That's Yahoo; correct?

A.        Yes.

Q.        And then it says point of contact for law enforcement, oath.com?

A.        Yes.

Q.        Who is that?

A.        Oath was the name of, essentially, a combined company of Yahoo and AOL when Verizon combined Yahoo -- Verizon purchased Yahoo and combined it with AOL, which it already owned, and created a company called Oath.

Q.        And what did Oath do?

A.        The same thing that Yahoo and Verizon Media did.  It was just a different name operated as an internet service provider providing content, operated things like Yahoo Sports and Finance.

Q.        So why is Yahoo then listed as the submitter and this Oath is -- or submitted as point of contact for law enforcement?

A.        I think because the domain hadn't been changed, but I'm not positive.

Q.        Is Oath law enforcement?

A.        Oath was a name for a -- for Yahoo and AOL, the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

company.

Q.        So you have no idea why Oath would be submitted as point of contact for law enforcement?

A.        It is still an -- it was a legal operating name for encompassing Yahoo.  And so the domain oath.com was pertinent to Yahoo and I guess they hadn't changed the domain name from Oath to Yahoo, but it is still, for all intents and purposes, the same company.

Q.        And Oath still exists?

A.        Oath does not exist anymore in terms of a -- the name of a company, but information or emails routed to oath.com would still be received by Yahoo in terms of business.

Q.        So at this part here where it says Oath Holdings, Inc. and Oath, Inc., collectively referred to as Oath, when law enforcement serves legal process upon Oath, law enforcement should reference the CyberTip reported, Oath's globally unique identifier, and it has a big value, reported image and CyberTip.  What's the purpose of that?

A.        Because -- so Yahoo, as people know it, like Yahoo email, Yahoo Sports, basically the name, the brand, the company has been bought and sold a number of times in the last -- or at least in the six years that I have been there.

Q.        Uh-huh.

A.        And the parent company, the holder, the legal entity name has changed a few times.  And so I think -- again, I am

not a lawyer, but in terms of serving legal process, the legal entity name has to be correct and so I think this is, in terms of serving legal process, the specific legal entity name that needs to be addressed.

Q.        Have you ever done any work under Oath or no? Through the company Oath or through the company name?

A.        The company name was Oath for a few years that I have been employed there, yes.

Q.        And at that time, was Oath separate from Yahoo, because Yahoo would have been an existing entity?

A.        It was -- I mean, for me, it was all the same.  The company name changed a few times.  I did the same work, had the same -- everything was the same for me other than the company name being different.  But that's, you know, again, just for my work.

Q.        From going in and out of the office and receiving paychecks?

A.        Yeah.

Q.        But as far as --

          MR. DAVIDOW:  Strike that.

Q.        You said a period of time that you worked for Oath. Did anything that you do in this case, was that related to Oath or no?

A.        So reference the CyberTip, yes, you know, legal process being served at the time that this CyberTip was

reported.  The legal entity names were still in the names Oath Holding, Inc. and Oath, Inc.

Q.      And let me ask you this:  This part here going back to Exhibit 6, this dedicated trust and safety team, were they within Oath as well?

A.      Yes.

Q.      And I think the question was asked on direct that Yahoo didn't have anything to do with law enforcement; is that correct?  Meaning law enforcement was not involved in the operations of Yahoo?

A.      In terms of reporting CyberTips?  They are not involved.

Q.      Okay.  Does law enforcement have any involvement with Oath?

A.      I mean, yes, in the sense that they submit legal process to us as an entity.

Q.      Okay.  I think I -- that's okay.  I'm following you.

Now, I'm going to keep this exhibit here for a second.  And it says -- we went through it a couple times. I'll use it as what's called a demonstrative for some other ones because they're similar, these CyberTip reports.

It says here, "Did reporting view the entire contents of the uploaded file, ESP?"

It says, "Yes."

"Did reporting ESP view the EXIF of the uploaded

file?"

"Yes."

What's the difference between contents and EXIF?

A.      So the contents are going to be, you know, the images and videos that contain the CSAM.  And the EXIF is going to be like the metadata, the timestamp, uploads information, if there is information related to, you know, like the type of device that was used to create the content, that type of information.

Q.      Now, at the time that this, let's call it, tip or document is being filled out, is this automated at Yahoo or Oath, whatever was doing it at the time, is this automated, meaning one of the six is sitting somewhere and this gets filled out by them clicking or checking boxes?

A.      The CyberTip --

Q.      Yes.

A.      -- information?  Yeah, the information is pulled right from the content itself as well as it's pulled from the subscriber information.

Q.      So no one's sitting there like on a PDF typing in lines or anything to do this?

A.      Not for this CyberTip.  In my supplemental, yes.

Q.      Okay.  And is there anywhere in this file, let's call it -- this is Exhibit 1A -- where it tells us who from Yahoo reviewed this?

A.      I do not believe so.

Q.      So we don't have a person's name run the CyberTip?

A.      No.

Q.      We don't have any identifying marks of who that human being is on the CyberTip?

A.      No.

Q.      Basically, we have a automated semi, let's call it, from your testimony -- and I don't want to change your testimony -- automated entry port that says yes is basically what comes down to it, that there was some human interaction?

A.      Yeah.  I mean, it's physically impossible for our company to submit a CyberTip without there being human review and interaction.

Q.      Well, you mean you can't say no on this box?

A.      You can check no.  But that means you hadn't reviewed the content, in which case, you would not submit a CyberTip.

Q.      Are you saying that no CyberTips are submitted with no?

A.      I mean, in my experience, I have never seen one that is submitted where someone says I did not review the contents but I'm still submitting the CyberTip.

Q.      But that box gets filled out automatically, as we've determined; correct?

A.      Correct, because they have just reviewed the content.

Q.      And there's something within the program for which you've never seen Yahoo submit a tip that says no?

A.      No.  But I also don't -- I don't see this when it gets submitted.  The only time I'll ever see this is in an instance like this.

Q.      Now, is there a way you could see who submitted the CyberTip, the person's name?

MS. VIACAVA:  Your Honor, the government would object as to relevance.  The company itself has already sent a representative over indicating their procedures.  They have -- they don't necessarily want to give an individual's name nor do they have to give an individual's name.  Defense counsel, from his motion, seemed to be seeking that information, but the government would argue it's not relevant nor is it something that should be required at this time of this private company that provided the CyberTip.

THE COURT:  And, Mr. Davidow, why is that relevant?

MR. DAVIDOW:  I think it's absolutely relevant and that's the fine line that I was saying this is going to come down to.  And the reason is because we have employed substantial technologies that we've seen and gone through that exist without human interaction whatsoever and those fit within a narrow scope of a warrantless search within the constitution.  And I'm not suggesting to the Court for any reason whatsoever that, let's call it, these six individuals -- be that as we may; we're taking the testimony; we don't have information -- should be openly disclosed to the world.  That's not what I'm

saying.

But what I am saying is there should be a portion of this process which protects constitutional rights in a way in which we handle lots of things in court that are of a sensitive nature.  We have in-camera proceedings for which the judge yourself can look at and say there's substantial information for which I can determine from here that this is a human being, that a human being reviewed it.

And so I think the Court has to make a ruling now on that objection, which is the finite objection, or the finite point, but I think the fact is that within these processes, because of the nature of the technology that we're employing, or being employed, and really stuffing it into this narrow box for a warrantless search is, essentially, what's occurring, that we should have a process for which the review can be done appropriately to protect those rights.

THE COURT:  All right.

MR. DAVIDOW:  So my --

THE COURT:  And you have a person here who has testified to all of that information who has that information at her fingertips.  She's described how the process works.  So I'm sustaining the objection.  Who reviewed it is not important.

BY MR. DAVIDOW:

Q.      Do you know the name of the individual that reviewed

it?

A.          I do not.

Q.          Is there anybody at Yahoo that knows the name of the individual that reviewed it?

            MS. VIACAVA:  Objection, Your Honor.  The Court's already ruled.

            MR. DAVIDOW:  Different question.  I'm not asking for the name.

            MS. VIACAVA:  Your Honor, from the testimony, this is a private company that conducted their own search on their platform.  They've indicated what they reported to the National Center for Missing and Exploited Children that ultimately went to law enforcement.  They confirmed law enforcement was not a party to any search that they did.  They've already talked about their own terms and services.  We would argue this is not relevant, this whole line.

            THE COURT:  Sustained.

            MR. DAVIDOW:  Just so I understand, Your Honor, the objection is sustained as to the question as to whether anyone at Yahoo would know the name.

            THE COURT:  Yes.

            BY MR. DAVIDOW:

Q.          Going back to 1A, Exhibit 1A.  I wrote on it.  Apologize, but at least it keeps my space here.

            In this email body it says, and let's just take this

top one here, jobs4rich@yahoo.com.  And I think we went over this.  The government had asked you that.  It was sent on April 14th of 2021; is that accurate?

A.    That's what it says, yes.

Q.    And this is an email that would have been captured somehow, automatically flagged because of what?

A.    Because it detected CSAM content.

Q.    All right.

A.    Or a hash match.

Q.    Hash match, I'm sorry.  And that hash match would have been included in whatever this filename 1.jpg is?

A.    Right.  It would be the hash associated with the file.

Q.    Okay.  And it looks like there's this jobs4rich and it's being sent to some -- what is that, cell phone number at My Metro PCS?

A.    That's what it looks like.

THE COURT:  Can you try to --

MR. DAVIDOW:  Oh, zoom in?

THE COURT:  Uh-huh.

MR. DAVIDOW:  Sorry, Your Honor.

BY MR. DAVIDOW:

Q.    Does that look like a cell phone number?

A.    Yes, it does.

Q.    Now, we'll go to the next one, this next email.  This

is April 14th.  Says jobs4rich and that's sent to reb3280@gmail?

THE COURT:  That's off the screen.  So you'll need to move it.

MR. DAVIDOW:  Sorry.

THE COURT:  Thank you.

MR. DAVIDOW:  Sorry.

THE COURT:  That's all right.

A.      Yes.

Q.      Okay.  And then we had identified down here, when you said this, there was a verification.  We have a number (239) -- what is that -- 271-19854?

A.      271-9854, yes.

Q.      Okay.  And you said this was verified.  How was that verified?

A.      So there's a few different ways.  Basically, a push message, a one-time code that is sent to the phone number on record for the user to basically accept and say yes, this is me.

Q.      Is this another kind of automated process, to verify?

A.      Yes.

Q.      And how does that process get employed?  When you say some push message?

A.      So, I mean, I can't technologically describe it because, again, that's not my lane, but from my layman's terms,

understanding, essentially, our system has a mechanism through which it sends a message to the phone number specified and whoever is in control of that device, you know, gets -- hits accept that I am in control of this device.  That sends a message back to our system that says hey, yes, we verified that someone is in control, received our message, and then it timestamps it.

Q.    Can a member of the general public employ this software or this push notification?  Like could I go out somehow and employ this push notification to find out that that person's number is their number?

A.    I mean, maybe.  Would it be coming from Yahoo?  No. I mean, I'm sure other companies do something similar, but as a private citizen, could you do it?  I don't know.  If you had the technological skills, I'm not sure.  But it wouldn't say hey, it's coming from Yahoo.

Q.    So a member of the general public couldn't just go in and employ Yahoo's services to obtain this push message back for the verification; correct?

A.    Generally speaking, no.

Q.    Now, do you know what's blacked out here?

A.    I don't specifically.

MS. VIACAVA:  Your Honor, for the record, the government in these examples took out part of the hash value so that the numbers don't become public information.

MR. DAVIDOW:  Oh, okay.  I didn't know.

MS. VIACAVA:  So it does indicate it's the hash value.  It's part of the discovery that was given out so the government took those portions out.  It didn't seem to affect the actual information, but it prevented the hash values that law enforcement and everyone utilizes to identify which files law enforcement's aware of.

THE COURT:  All right.  Thank you.

MR. DAVIDOW:  Just so I am clear, then the only thing that's under that is more numbers?

MS. VIACAVA:  Yes, Your Honor.  For the record, it's just a string of numbers that make up a hash value.

MR. DAVIDOW:  Okay.

THE COURT:  Thank you.

BY MR. DAVIDOW:

Q.    So if we're looking at --

MR. DAVIDOW:  That's interesting.

MS. VIACAVA:  And, Your Honor, also, for the record, the government took out the date of birth that was also provided, again, to protect PII.  So that has been taken out as well.  It indicates that it was provided; it just takes out one of the numbers so that we're not -- if this becomes public information, we're not handing out PII.

THE COURT:  Thank you.

BY MR. DAVIDOW:

Q.      So I guess my question is, when you're looking at this and it says that there were six files uploaded, and then we see here what looks to be this CFFAEF4E, and if we jump down here, CFFAEF4E, and then there's a -- it looks like a 11 and they all have the same filename.  Are they different files or are they the same file?

A.      Oftentimes, they are the same file.

Q.      Is there a reason why they would have different hash values if they're the same file?

A.      No.  And I can't actually see the entire hash value here.  They look similar to me, but I can't tell what's under the black portion.

Q.      So if we go to the second page, there's another 1jpg, has the same file number, but this one starts with a 5.

A.      Uh-huh.

Q.      Is it your understanding that all the hash values are supposed to be unique identifiers to a single image that has been previously identified as CSAM?

A.      So the same image will have the same hash value; however, images can be called -- we could have ten images that have the same filename that are all different images, just based on what -- what they were saved as.

Q.      And so when this says that six files have been uploaded here, is this saying that there's six unique files that are uploaded or just --

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.          Just six files.

Q.          Let me ask you about this one here.  There's a question that appears on all of them back to Exhibit 1A.

Were entire contents of uploaded file publicly available, and then in closed parentheses, it says information not provided by company.  How is that supposed to be answered?  Is that something that Yahoo never answers?

A.          That's not something I'm familiar with.  I would imagine that we never provide this information to the public because it's illegal content, but I'm not -- I think there are probably other platforms, you know, that have different -- this is information that other service providers would fill out as well.  I'm not familiar with that sentence or that question in regards to our company.

Q.          And so when one of these six who we don't know who it was goes through this other program to fill this out, kind of like a data entry semi-automated program, that program has already deselected the ability to enter information; is that fair to say?

A.          What do you mean has deselected the --

Q.          Well, you said that you've never seen this being filled out by Yahoo or Oath.  So I'm asking do you know whether or not this other program that's used to populate it doesn't even give the user the opportunity to fill that out?

A.          I'm not sure because I don't submit CyberTips.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.          Have you seen, when you go in to do your review, whether or not that's even an available data entry?

A.          So, from what I do know, those fields are -- they can be changed.  So like I was saying before, you know, the content moderator, the trust and safety individual can actually, you know, select yes, select no to those fields.  They can input information in here.  Obviously, in this instance, for that specific question, it's not provided.

Q.          So, from your understanding, there is a possibility to provide information for this question were the entire contents of uploaded file publicly available?

A.          I would think so.  But, again, that's -- I don't submit them so I'm not 100 percent sure.

Q.          You don't know what this kind of automated, semi-automated document entry screen looks like because you're not one of the six that look at it, do that?

A.          I have seen it in my training and looking at it. But, again, it's not something that I do on a daily basis.

Q.          And we went through -- there was a question asked about these categories.  And it says here the categorization system was created by various ESPs in January of 2014.  Is this categorization tied to a specific hash value?

A.          The categorization is tied to what the human content reviewer is looking at and what they -- basically, how they judge the image based on this categorization.

Q.        So the hash values as to how they are attached and says they have this categorization here, if we're looking at it, apparent child pornography, if we're looking at this with this CFFAE number, and the categorization says apparent child pornography, but this A1 is not something that's tied to the hash value of the photograph or whatever it was, the media?

A.        Our moderators input the information themselves.

Q.        Have you ever been made aware of a time where a report was sent to NCMEC where there was a hash value of some, let's call it, previously identified child pornography and it was kicked back by a moderator because the classification was incorrect?

A.        You mean has NCMEC sent something back to us because they feel like the classification is incorrect?

Q.        Yes.

A.        Not that I know of.

Q.        And so you're unaware of any situation or any inquiry back from NCMEC where somebody might say A1 and it's a B2?

THE COURT:  Mr. Davidow, how does this go to your motion to suppress?  It seems like we're just doing -- kind of on a fishing expedition doing discovery here.  How does this --

MR. DAVIDOW:  No, no, no.

THE COURT:  -- relate to your motion to suppress?

MR. DAVIDOW:  Again, I'm trying to lay sufficient record to demonstrate the robust and automated system which

exists and the narrow exception that it's then shoved into. And so I understand the Court's ruling. I just -- I'm trying to get through some of those items and demonstrate use, usage, things that are publicly available, things that aren't.

THE COURT: Okay. But how does it matter whether NCMEC sent something back to them saying it's really not an A1, it's a B something?

MR. DAVIDOW: I think that would tend to show that sometimes these things are more automated than they are inputted, but we have other witnesses to come in so.

THE COURT: Okay. Go ahead and move on.

BY MR. DAVIDOW:

Q.      Now, going back to 1A, in this report, as we identified, there was that push notification that came back and had this number; correct?

A.      Uh-huh. Yes.

Q.      I want to go to -- I think it was 2B was the report that you were involved with. And the 2B identified a phone number here as (239)667-1643. It's a different number than was identified on the push notification for, let's call it, 1A; is that correct?

A.      It appears to be different, yes.

Q.      Does your report at all identify this other cell phone number that was identified in the first report as (239)271-9854?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.          I don't think it does.

Q.          Now, also, you had stated that once the offending material is identified, the account is deactivated; correct?

A.          Right.

MR. DAVIDOW:  I'm sorry, Your Honor, there's just a lot of numbers and things so I'm getting a little confused on it.  I'm just trying to make sure I have the right paper and numbers.  I'll come back to that.  Let me keep going.  I'm sure it will come up.

BY MR. DAVIDOW:

Q.          This is 2 -- excuse me, 1B.  This is the report on 5/12 of -- May 12, 2021.

If we're looking at this email here, this email on May 9th, it seems to say pennybi4u@yahoo.com.  That's a Yahoo email address?

A.          Yes.

Q.          And let me zoom out a little bit.  Okay.

And then, down here, there's another email address, reb3280@yahoo.  That's another Yahoo email address?

A.          Yes.

Q.          And so then this email address would have been sending to this email address these attachments; is that fair to say?

A.          Yes.

Q.          Okay.  And were these attachments flagged as CSAM or

child pornography?

A.        Yes.

Q.        Okay.  And I'm going to go to 1C.  And then there's this, let's see here, about middle of the page, looks like the email address has a gmail.com account.  That's not a Yahoo email; correct?

A.        Correct.

Q.        But it is being sent to a Yahoo email; correct?  Sorry.

A.        Correct.

Q.        And then that email is sending what was flagged as child pornography?

A.        Correct.

Q.        I want to go to 1D.

          What is mailer -- what is that -- daemon@yahoo.com.  What is that?

A.        Usually, that's indicative of a mail error, an email sending error.

Q.        The from is an email sending error?

A.        Yeah.  Oftentimes, the email address in the to field will have attempted to send a message, and if for some reason the message cannot get sent, you will often get a response from the system, which would be the mailer-daemon@yahoo.com indicating that there was a failure, which is what the subject line says, failure notice.

Q.        And so then this mailer-daemon sent to this email address yngluv01@yahoo.com, an email that contained an attachment?

A.        That's what this indicates.

Q.        And that email that contained the attachment, was that attachment identified as CSAM?

A.        It appears it was.

Q.        And who generates an email from this mailer-daemon@yahoo.com?

A.        An internal Yahoo system.

Q.        So there's an automated email within the internal Yahoo system that sent CSAM to an email address that was then flagged and reported to NCMEC?

A.        Not exactly.  Can I clarify?

Q.        Absolutely.

A.        Okay.  So the email is in here.  So an account is only going to get flagged in our platform for sending originally.  That's how it becomes -- it gets added into that tool that we talked about and that's how the content moderators on the trust and safety become aware of that account at all.  So they will see the content that was flagged from the automatic scanning.

When they determine that yes, the content that was flagged in the automatic scanning is indeed CSAM, they will initiate a review of every other file in that user's email

account.  So that would be in their inbox, in their draft folders, in their other folders within their mailbox.  So they are looking for any and all other CSAM in that user's account.  So not just CSAM that's in the sent mail.

Q.        So how do we know from these NCMEC reports when the, let's call it, scanning software that's always existing that flags the hash values alerts or this is just -- and when you say they, I mean, I'm assuming we're talking about one of the six who were unidentified.  Is that -- you said they.

A.        The moderators, yes.

Q.        Okay.  So amongst the they that we don't know who they are, when they do this search through the emails, how do we know the difference in these NCMEC reports between when they're just looking at the content versus when the automatic flagging from the hash tags occurs?

A.        Because the images -- there's a section in the CyberTip that has the hash values of the files themselves.  So if there is a known hash match, that hash is identified and it will be something that is matched up with NCMEC.

Again, there can be, you know, CSAM that has not been identified yet that they find, you know, again, like I said, it might be something in the user's inbox or in a different field or -- sorry, in a different folder.

Q.        So I guess I'm -- and I don't -- I'm trying to figure it out.

It appears that these all have some type of hash value; is that fair to say?

A.       Yes.

Q.       Okay.  And I guess my question was a bit not clearly worded.

Is there a way in which we know from the CyberTip report that the CyberTip was coming from the automated software that flags the content by hash value or this was when one of the unidentified six are just looking through an account?

A.       Do you mean is there a way that we know of the specific emails reported in the CyberTip which ones were flagged by the automated scanning and which ones were --

Q.       Correct.

A.       -- flagged by a human content monitor?

Q.       Correct.

A.       Well, NCMEC will know based on if there is a hash match.  So -- right -- in each one of these, it's going to say hey, this is the hatch value.  And if it's something they're already aware of, they will know.

In the tool that the moderators use, it says -- right -- hey, there's two PDNA matches here, and that's what flagged it originally.  I don't see that information right here on this CyberTip, but it is in the tool.  It tells us, you know, if there was a PDNA match -- sorry, a photo DNA match.  And then NCMEC would also have that information on hand as

well.

Q.        So then is there a way that we can tell whether or not this one was just flagged by the tool or this one was flagged by the six going through the account, one of the six?

A.        Well, this one specifically would not have been flagged by the tool because it's, again, being received by the yngluv01@yahoo.com.  And again, we are not flagging users' accounts upon the reception of CSAM content.

Q.        On these CyberTip lines where there's -- here, that's what I wanted to go into.  Let's take 2B, the one you did, 2B.  Going to 2B, page 3.  What is TLO?

A.        TLO a commercial database run by TransUnion that we use to, you know, find information on individuals when we are doing -- conducting investigations.

Q.        Can anyone have access to this TransUnion database?

A.        Anybody could have access to the TransUnion database if you signed up and got an account.

Q.        You have to sign up and get an account.  Do you know what restrictions there are to sign up and get an account for the TransUnion database?

THE COURT:  Okay.  Mr. Davidow, again, I'm not sure how this goes to anything.  This is -- this TLO is her investigation of Mr. Brillhart and the fact that there is, apparently, a prior conviction for a sexual offense.  How does this go to a Fourth Amendment violation?  I'm just not seeing

it.  I'm sorry.

MR. DAVIDOW:  And that's okay.  Again, I'm just trying to lay the record to demonstrate the robustness of this and the disparity that this is related to the narrow exception for what the Private Search Doctrine is.  And the Private Search Doctrine, again, there's an exception to the search warrant requirement and then what we have now, and I just want to make sure the record's clear, is that there's accessing of databases, there's other subscriptions, and if we can agree that I've done substantial effort for which to lay the robustness of how this is done, I could end my questioning.  I just -- I think that it's important that we have kind of a clear record that this is a little bit different than a wife stumbling on a piece of paper in a house.

THE COURT:  Okay.

MR. DAVIDOW:  Or a neighbor stumbling on a piece of paper in a home.

THE COURT:  All right.  And I think we have that clearly established.  So I think --

MR. DAVIDOW:  Okay.

THE COURT:  -- you can move on.

MR. DAVIDOW:  Can I have one second, Your Honor?

THE COURT:  Yes, you may.

(Pause.)

MR. DAVIDOW:  Your Honor, my client has requested to

use the restroom.  I was just kind of asking him, as is his right, some thoughts on things and he explained to me that he has the inability to think right now as a result of the necessity to use the restroom.  So I apologize.

THE COURT:  All right.  We're going to go ahead and take our noon recess then.  We'll be in recess until 1:00 o'clock.

You may step down.  Please don't discuss your testimony with anyone.

Did you have anything else from the government?

MS. VIACAVA:  No, Your Honor.

THE COURT:  Okay, thank you.

(Luncheon recess taken at 11:50 a.m.)

AFTERNOON SESSION

(Time noted:  12:58 p.m.)

THE COURT:  All right.  We're back on the record.

All right.  The defendant is present in court.  The witness is now back on the witness stand.

Mr. Davidow, you had just finished your cross-examination.  Was there any additional questions that, after speaking with your client, you wanted to ask?

MR. DAVIDOW:  No additional questions, Your Honor.

THE COURT:  All right, thank you.

Any redirect?

MS. VIACAVA:  No, Your Honor.

THE COURT:  All right.  Then you may step down.  Thank you very much.

And is she excused?  Any objection to excusing her at this time?

MS. VIACAVA:  Yes, Your Honor, the government would excuse this witness.

THE COURT:  All right.

Then you are excused.  Thank you.

THE WITNESS:  Thank you.

(Witness is excused at 12:58 p.m.)

THE COURT:  You may call your next witness.

MS. VIACAVA:  Your Honor, at this time, the government would call Anjali Shrestha to the stand, please.

(Pause.)

THE COURT:  Ma'am, if you would step forward.  I'm going to have you come towards the witness box and then the clerk will swear you in.  If you would stand and raise your right hand from there.

THE DEPUTY CLERK:  Do you solemnly swear or affirm that the testimony you're about to give in the case that is now before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE DEPUTY CLERK:  Can you please state your full name and spell your last name for the record?

THE WITNESS: Anjali Shrestha. S-H-R-E-S-T-H-A.

THE DEPUTY CLERK: Thank you. Please have a seat.

THE COURT: You may inquire.

Thereupon,

ANJALI SHRESTHA,

Having been called as a witness on behalf of the Government, and having been first duly sworn by the Courtroom Clerk, was examined and testified as follows:

(Time noted: 1:00 p.m.)

DIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT

BY MS. VIACAVA:

Q.      Good afternoon.

A.      Good afternoon.

Q.      How are you employed?

A.      Sorry. What did you say?

Q.      How are you employed?

A.      I work at Google LLC.

Q.      And what is your duties and responsibilities for Google LLC?

A.      I'm a custodian of records and I review and respond to requests from law enforcement and testify to the authenticity of records in trial or court.

Q.      And how long have you been employed by Google?

A.      Seven years.

Q.      And have you always worked in that particular

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

capacity for Google?

A.      Yes.

Q.      And just briefly, what type of company is Google?

A.      Google is an internet service provider that provides services that are free, such as gmail or Google search.

Q.      And to your knowledge, does Google have an interest in protecting its business platform?

A.      Yes.

Q.      And what steps or procedures does Google follow in order to protect its platform?

A.      To protect Google's platform, Google -- Google tries to make sure that the terms of service that a user would sign up was properly followed and not breached.

Q.      In preparation for coming to court today, did you have an occasion to prepare a declaration?

A.      Yes.

Q.      Pertaining to this particular investigation and case?

A.      Yes.

Q.      And in there, did you provide information regarding the company you work for, Google, and the procedures that they follow?

A.      Yes.

        MS. VIACAVA:  Your Honor, may I please approach the witness?

        THE COURT:  You may.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

(Pause.)

BY MS. VIACAVA:

Q.      I've handed you what's been admitted into evidence as Government's Exhibit No. 10.  Is that the declaration you prepared for this case?

A.      Yes.

MS. VIACAVA:  And at this time, the government would seek to publish Government's Exhibit No. 10.

THE COURT:  You may do so.  And you may publish freely any of the exhibits that have been previously introduced.

MS. VIACAVA:  Thank you.

(Pause.)

BY MS. VIACAVA:

Q.      Do you need some water?  Please take a moment.

(Pause.)

MS. VIACAVA:  If it's okay, I'm going to close this down so that you can save your battery.

BY MS. VIACAVA:

Q.      Okay.

A.      Sorry about that.

Q.      That's okay.  Are you okay now?

A.      Yes.

Q.      Okay.  In looking at Government's Exhibit No. 10, did you provide information regarding your particular role with

Google?

A.        Yes.

          (Pause.)

Q.        And besides providing information about how long you've worked with Google and what your particular role is in Google, did you also provide information regarding Google products and its terms of service?

A.        Yes.

Q.        Can you please read what's displayed on the screen?

A.        "Google provides internet based services.  Google's terms of service, which a user must accept as part of registering a Google account, prohibit our services from being used in violation of the law and to abuse or harm others, and specifically calls out child pornography as violative content. See Google's terms of service.  Last visited February 17, 2023, available at," and the URL is included.

Q.        And are you familiar with Google's terms of service?

A.        Yes.

          MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 7 that's been admitted into evidence.

Q.        And for the purposes of this case, would this be the version or the terms of service that were in effect in 2021?

A.        Yes.

Q.        In Google's terms of service, can you please read

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

what is indicated on the screen?

A.      "These terms help define the relationship between you and Google.  Broadly speaking, we give you permission to use our services if you agree to follow these terms, which reflect how Google's business works and how we earn money.  When we speak of Google, we, us, and our, we mean" --

Q.      I just need you to read to the end of the sentence.

A.      Oh.

Q.      Does it indicate you agree to follow these terms?

A.      Yes.

Q.      Okay.  And in Google's terms of service, does it have a provision that talks about respect others?

A.      Yes, I believe so.

Q.      I think there's a screen in front of you, if that would be easier to read on that monitor.

A.      Oh.

Q.      If not, you can certainly look at the screen behind you.  I'm just not --

A.      Yes.  I see that right there.

Q.      Whatever's more convenient for you, it should be the same.

A.      Thank you.

Q.      Under the provision respect others, can you please read what's highlighted in the terms of service?

A.      "Many of our services allow you to interact with

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

others.  We want to maintain a respectful environment for everyone, which means you must follow these basic rules of conduct."

"Comply with applicable laws, including export control, sanctions, and human trafficking laws."

Q.      And can you read the section that's highlighted?

A.      "Don't abuse or harm others or yourself or threaten or encourage such abuse or harm.  For example, by misleading, defrauding, defaming, bullying, harassing, or stalking others."

Q.      And can you read the first full sentence that is highlighted?

A.      "Our service specific additional terms and policies provide additional details about appropriate conduct that everyone using those services must follow.  If you find that others aren't following these" --

Q.      I just needed the first full sentence.  Thank you.

Can you please read the highlighted portion under purpose from the terms of service and starts with this includes?

A.      "This includes using automated systems and algorithms to analyze your content for spam, malware, and illegal content."

Q.      If you can please read the sentence that's highlighted?

A.      "This analysis occurs as the content is sent,

received, and when it is stored."

Q.        And from this provision from the terms of service, is it notifying users that Google is checking the contents of what they use on their platform?

A.        Yes.

Q.        And specifically, it indicates that they're looking for illegal content in the provision you just read right before?

A.        Yes.

Q.        It specifies illegal content?

A.        Yes, it specifies illegal content.

Q.        And in the terms of service, does it also advise a subscriber what would happen if they remove something from their service, from Google's service?

A.        Yes.

Q.        Can you please read the highlighted portion?

A.        "If you remove from our services any content that's covered by this license, then our systems will stop making that content publicly available in a reasonable amount of time. There are two exceptions.  If you already shared your content with others before removing it.  For example, if you shared a photo with a friend who then made a copy of it, or shared it again, then that photo may continue to appear in your friend's Google account even after you remove it from your Google account."

Q.          So it's letting an individual know that their contents can live on within Google?

A.          Yes, if it -- if the user had shared it, according to this excerpt.

Q.          And then to the terms of service, does Google also provide information regarding suspending or terminating access to a subscriber's account?

A.          Yes.

Q.          Can you please read the highlighted portion?

A.          "Google reserves the right to suspend or terminate your access to the services or delete your Google account if any of these things happen.  You material or repeatedly breach these terms, service specific additional terms or policies."

Q.          Can you please read the highlighted portion that's also under the suspended or terminating your access to Google's services?

A.          "We reasonably believe that your conduct causes harm or liability to a user, third party, or Google."

Q.          So, essentially, in the terms of service, Google notifies a subscriber that their content will be viewed; is that correct?

A.          Can you repeat the question?

Q.          In the terms of service that Google has put out and some of the provisions we've read, not necessarily this one, but in the provisions that you've just read aloud, Google

provides that an individual subscriber's account, the content will be reviewed by Google; correct?

A.      The terms of service outlines that if a user breaches the terms of service, there might be additional steps or protocol taken.

Q.      Under the purpose that's provided in the terms of service, does Google indicate that they can use automated systems to analyze content of a user's account?

A.      Yes.

Q.      And it indicates that they're looking for such things as illegal content?

A.      Yes.

Q.      And it indicates the analysis occurs when content is sent, received, or stored?

A.      Yes.

Q.      And has that been Google's policy for a number of years as to the terms of service, essentially?

A.      This terms of service, I believe, was dated in March. It was at the top.

Q.      But Google still has the terms of service that, essentially, implies or, essentially, provides for the same provisions?

A.      Yes, Google has an updated terms of service.

Q.      Okay.  And in so doing, in looking at content for a subscriber's accounts that they may locate, does Google have

any particular policy or procedures in effect if Google becomes aware of child pornography or child exploitation material on its service?

A.       Yes.

Q.       What procedures does Google follow, in general?

A.       So, among voluntary efforts, Google uses a proprietary hashing technology to detect apparent CSAM and that that CSAM file would be reviewed by a Google reviewer or the hash of that CSAM file would match the hash of a file that was previously reviewed by a Google reviewer.

Q.       So Google has a department, essentially, that reviews materials and a department that would make CyberTip reports?

A.       Yes.

Q.       Okay.  And when you talk about CSAM, you mean child sexual abuse material?

A.       Yes.

Q.       That would include child pornography?

A.       Yes.

Q.       And when Google becomes aware of such material on their platform, what steps do they take?

A.       When Google discovers CSAM that constitutes child pornography, Google provides a report to NCMEC.

Q.       The National Center for Missing and Exploited Children?

A.       Yes, via a CyberTip.

Q.        Okay.  And does Google also provide a classification for the file as well?

A.        Yes.

Q.        And do they provide information regarding subscriber information Google may have for that customer?

A.        Yes.

Q.        And in preparation for coming here today, did you become aware of the fact that Google made three reports to the National Center for Missing and Exploited Children?

A.        Yes.

Q.        And that is routine for Google when they become aware of child exploitation material on their service; correct?

A.        Yes.

Q.        And does Google, in fact, publish or make available on its site a transparency report that details its efforts?

A.        Yes.

          MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 9A that's been admitted into evidence.

Q.        And in Google's transparency report, does it provide the efforts it makes to combat child exploitation material being on the service?

A.        Yes.

Q.        Can you please read the highlighted portion?

A.        "Google is committed to fighting child sexual abuse

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

material online.  CSAM is illegal and our terms of service prohibit using any of Google's platforms or services to store or share this abhorrent content.  Across Google, our teams work around the lock to identify, remove and report this content using a combination of industry leading automated detection tools and specifically trained reviewers.  We also receive reports from third parties and our users, which complement our ongoing work."

Q.        Keep going.

A.        "We report CSAM to the National Center for Missing and Exploited Children (NCMEC), the clearinghouse and comprehensive reporting center in the United States for issues related to child exploitation.  NCMEC may send those reports to law enforcement agencies around the world."

Q.        And can you read the last sentence?

A.        "This report contains data regarding Google's efforts and resources to combat CSAM on our platform."

Q.        And in what's provided in the transparency report, Google references the fact that they're specially trained reviewers?

A.        Yes.

Q.        And are you familiar with the fact that Google does, in fact, employ a department or utilized specialized individuals for this type of materials --

A.        Yes.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        -- found on their platform?

A.        Yes.

Q.        And in particular, Government's Exhibit No. 9A covers what timeframe?

A.        From the printout, it looks like it covers from January 2021 to June 2021.

Q.        And what is the total number of reports that Google has indicated in its Google transparency report that it's made to NCMEC?

A.        From this picture, it shows at 412,141.

Q.        And down below, can you read the highlighted portion?

A.        "A report sent to NCMEC may include information identifying the user, the minor victim, and/or other helpful contextual facts.  It may be the case that there was more than one report sent on a particular user or piece of content.  For example, in cases where content is identified from multiple sources, NCMEC may send those reports to law enforcement agencies around the world."

Q.        So, from the transparency report, Google has made clear to the public that they're going to report this, any materials found to the National Center for Missing and Exploited Children?

A.        Yes.

Q.        And in the report, it also makes clear to the public that law enforcement could be notified by NCMEC?

A.        Yes.

Q.        Google doesn't notify law enforcement, they notify the National Center for Missing and Exploited Children; correct?

A.        Yes.  As stated here, the report would be sent to NCMEC.

Q.        And these steps and procedures that Google talks about in its efforts to combat online child sexual abuse materials, these are procedures that Google has put in place? These are their standard procedures?

A.        Yes.

Q.        This isn't at the direction of law enforcement or with the involvement of law enforcement?

A.        No.

Q.        And from this report from January 2021 through June 2021, how much content was reported to the National Center for Missing and Exploited Children, according to the transparency report?

A.        This printout shows 3,413,673.

Q.        And can you please read the provision that's highlighted in Government's Exhibit No. 9A?

A.        "When we identify CSAM on our platforms, we make a CyberTipline report to NCMEC.  A single report may contain one or more pieces of content depending on the circumstances.  This content could include, for example, image, videos, URL links,

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

and/or texts soliciting CSAM.  A single piece of content may be identified in more than one account on more than one occasion; so this metric may include pieces of content reported more than once."

Q.        And in the transparency report, how many accounts during the time period of January 2021 through June 2021 did Google indicate that they had disabled accounts?

A.        This printout shows 129,174.

Q.        129,174?

A.        Yes.

Q.        Can you please read the highlighted portion?

A.        "When CSAM is identified in a user's Google account, we send a CyberTipline report to NCMEC and may disable the account.  Users are notified of the account termination and are given the opportunity to appeal."

Q.        Can you please read the highlighted portion?

A.        "When we identify new CSAM, we may create a hash of the content and add that to our internal repository.  Hashing technology allows us to find previously identified CSAM.  We also share hash values with NCMEC so that other providers can access these hashes as well.  Contributing to NCMEC's hash database is one of the key ways to fight online CSAM across industry.  This metric represents the cumulative number of hashes Google has contributed to this effort."

Q.        And how many CSAM hashes has Google contributed,

according to the transparency report?

A.          This screenshot depicts 1,997,505.

Q.          And can you read the highlighted portion?

A.          "Google is committed to working across industry with experts and policymakers around the world to combat the spread of CSAM online."

          MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 9B that's been admitted into evidence.

Q.          What is the date of this Google transparency report?

A.          July 2021 to December 2021.

Q.          And during that timeframe of July 2021 through December of 2021, in the transparency reports, what were the CyberTipline reports to NCMEC that were made by Google?

A.          This printout indicates 458,178.

Q.          And for the timeframe of this particular transparency report, Government's Exhibit No. 2B, what is the total content reported in the transparency report?

A.          This printout indicates 3,282,824.

Q.          And during the time period of July 2021 to December 2021, how many accounts were disabled, according to Google?

A.          This printout indicates 140,868.

          MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 3A that's been admitted into evidence.

Q.        Government's Exhibit No. 3A, is this a CyberTip report that was made by Google?

A.        This looks like a copy of a CyberTip and this looks like the submitter here was labeled as Google and our alias, uslawenforcement@google.com.

Q.        Looking at the CyberTip report number, would you agree this is one of the report numbers that's -- that is -- hold on one moment.

(Pause.)

BY MS. VIACAVA:

Q.        The Government's Exhibit No. 3A was a CyberTip report that was made by Google on a May 10th of 2021?

A.        Our declaration states that Google provided a CyberTip to NCMEC on May 10, 2021.

Q.        Okay.  And the CyberTip referenced what type of incident?

A.        The CyberTip referenced child pornography or CSAM.

Q.        And in the CyberTip, did Google provide what information it had regarding the subscriber to include the name the subscriber may have used, date of birth the subscriber may have given, as well as the email address that Google had for the account?

A.        Yes.  Google produced the basic subscriber information that Google would produce in the normal course of business pursuant to submitting a CyberTip.

Q.        And what is the name that was provided?

A.        This screenshot here says that the name is Reb Reb.

Q.        And what is the email address that is referenced?

A.        The email address listed on this printout is reb3280@gmail.com.

Q.        And it indicates verified.  What does that mean?

A.        On a Google record, verified means that the user has, in some way, verified that they have access to the account and that that they provided a secondary number or a phone number that may have sent them a PIN to confirm that they actually had access to that -- their account.

Q.        So according to Google records, that email address was verified?

A.        According to this printout that has verified next to this gmail account, if Google provided the term verified, that's what it means, yes.

Q.        And did Google also provide any IP addresses that they may have had or captured for that particular email address?

A.        Yes.

Q.        Okay.  Can you please read the highlighted portion?

A.        "Google became aware of the reported content which was stored in Google's gmail infracture."

Q.        And would this have been information that Google provided to NCMEC in the report?

A.          Yes, Google would provide the product or infrastructure it was stored in when submitting a NCMEC report.

Q.          And did Google also provide two files to NCMEC along with the -- as part of the CyberTip?

A.          Yes, the CyberTip report reflects that two files were attached to that report.

Q.          In making the CyberTip report, did Google also provide the filename, the hash value for the file?

A.          Google would provide just the standard course of production that we would for the image and provide the categorization of the image as well with the hash.

Q.          Okay.  And when you say categorization, what is the categorization that is seen for one of the files that was submitted with this particular CyberTip?

A.          B1.

Q.          And what is the categorization of B1 signify?

A.          Pubescent minor sex act.

Q.          And the categorization that is listed with the file B1, that would be a categorization that was given by Google to the attachment?

A.          Yes, in line with industry classification.

Q.          And in this particular first file, does it indicate whether or not the reporting ESP, in this case, Google, viewed the entire contents of the uploaded file?

A.          Yes, one of the files was labeled as ESP, yes.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        So when it indicates yes, based on your knowledge and training and experience from Google, does that mean an actual employee of Google looked at the file?

A.        Yes, it indicated that a Google reviewer had reviewed the file immediately or concurrently when sending the report to NCMEC.

Q.        Can you please read this highlighted portion from the CyberTip that's in Government's Exhibit No. 3A?

A.        "With respect to the portion of this CyberTip containing the heading was filed reviewed by company, when Google responds yes, it means the entire contents of the file reported reviewed by a person concurrently to or immediately preceding the sending of the CyberTip.  When Google responds no, it means that while the contents of the file were not reviewed concurrently to making the report, historically, a person had reviewed a file whose hash or digital fingerprint matched the hash of the reported image and determined that it contained apparent child pornography.  In some instances, Google will not provide an answer to this question, but will provide a description in the additional information field to explain the review conducted by a person at Google concurrently to or immediately preceding the sending of the CyberTip."

Q.        And is that consistent with the policy that Google follows in making these CyberTips?

A.        Yes.

Q.        Did Google provide information as to the second file?

A.        Yes.

Q.        Did it provide the filename and the hash value for the file?

A.        Yes.

Q.        And was it as to whether they reviewed the entire content?

A.        Yes.

Q.        And what was the response?

A.        So it means that the file's hash matched a hash of a file that had already been previously reviewed by a Google reviewer that was contained in the CSAM repository that Google has.

Q.        Okay.  But --

A.        CSAM repository of hashes.

Q.        But, at some point, a file matched an exact same digital fingerprint had been viewed by an employee at Google?

A.        It means that the hash or very similar to the hash matched a hash that was included in the CSAM hash repository, and for a hash to be assigned for an image to go into that CSAM repository, a Google reviewer would have to have reviewed that image.  So it just means that the file -- not viewed means that a Google reviewer did not review the file concurrently or immediately before sending the NCMEC report.

Q.        Which was not the circumstance with the first file;

the first file had been viewed in its entirety?

A.        Yes.

Q.        Okay.  And looking at the first file, does it provide the date and time of the upload?  I'll give you the whole sentence.

A.        This appears to be the date.  I have the date that Google sent the NCMEC report, which would be May 10th.

Q.        Is this the date and time that the subscriber uploaded the file?

A.        From this NCMEC record, it appears so.

Q.        And that would have been the information that came from Google; correct?

A.        Google would provide to NCMEC the -- yeah, metadata, yes.

Q.        Okay.  And so looking at the source information that was provided for the second file, it would be the same date and close time that the second attachment was uploaded; correct?

A.        From this NCMEC report, yes, that's what it looks like.

Q.        And that would be based on the information provided by Google?

A.        As I stated, Google would provide metadata.  And then, as I have my declaration, we made the NCMEC report on May 10th.

Q.        Okay.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 3B that's been admitted into evidence.

Q.        Is this another CyberTip that was made by Google of a different -- of a separate incident?

A.        This looks like a screenshot of a CyberTip and references Google as the submitter and the U.S. law enforcement alias as the point of contact.

Q.        What is the incident time that's -- or date and time that's provided?

A.        From this printout, it's dated May 18, 2021, but the tip provided in our declaration, Google provided that tip on May 19, 2021.

Q.        Okay.  And what type of incident was being reported by Google?

A.        Child pornography or CSAM.

Q.        And did Google also provide information as to the subscriber for this particular tip?

A.        Yes, Google would provide the standard subscriber information.

Q.        What is the name that was provided by Google?

A.        Reb Reb.

Q.        And does it provide a mobile phone number?

A.        Yes.

Q.        And it indicates verified on May 13, 2021.  What does

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

that signify or mean?

A.        That means that on that date, the user would go through Google's verification steps, which would mean that they had access to that phone.

Q.        Okay.  And does it also provide the email address?

A.        Yes.

Q.        Okay.  What is the email address?

A.        Reb3280e@gmail.com.

Q.        And does it also provide the IP addresses?

A.        Yes.

Q.        These are the IP addresses that Google had captured for that particular email address?

A.        Google would provide associated IPs in the subscriber file to NCMEC with the standard report.

Q.        And contained within the NCMEC report, does it indicate when Google became aware of the content?

A.        Google became aware of the reported content which was stored in Google photos infrastructure.

Q.        And did Google provide or upload a file to the -- attached to the NCMEC report?

A.        Yes.

Q.        How many?

A.        One.

Q.        And in the report, did Google provide the filename?

A.        Google would provide a filename in their standard

NCMEC CyberTip reports.

Q.        And did Google also provide the hash value as well as whether or not the reporting ESP viewed the entire content?

A.        Yes.

Q.        And in this instance, what was -- was there additional information provided by Google?  Instead of just answering yes or no, did they provide additional information as to this particular tip?

A.        Yes.

Q.        What was provided?

A.        A person at Google viewed the file to the extent necessary to confirm that it contained apparent child pornography concurrently to or immediately preceding the sending of the CyberTip.

Q.        So that would mean that this particular file, not a hash value, but this particular file was viewed to the extent necessary by an actual individual at Google?

A.        Yes, by a Google reviewer.

Q.        And was there a categorization provided by Google?

A.        B1.

Q.        And what does B1 signify?

A.        Pubescent sex act.

Q.        Pubescent minor engaged in a sex act?

A.        Yes.

          MS. VIACAVA:  At this time, the government would

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

publish Government's Exhibit No. 3C that's been admitted into evidence.

Q.      Is this a third NCMEC report -- or third CyberTip made by Google to NCMEC?

A.      Yes.

Q.      And when was this report made to National Center for Missing and Exploited Children?

A.      Google provided the NCMEC report on May 24, 2021.

Q.      And along with that, did Google provide the subscriber information for the account?

A.      Yes.

Q.      What is the name that was provided?

A.      This screenshot shows Reb Reb.

Q.      And was a mobile phone number provided?

A.      This screenshot indicates yes.

Q.      And when it indicates verified, would that have been the phone number was verified by Google?

A.      Yes.

Q.      For that subscriber?

A.      Yes.

Q.      And what is the email address associated with that particular subscriber account that's being reported?

A.      Luvemyng04@gmail.com.

Q.      And that's spelled L-U-V?

A.      Luvemyng04@gmail.com.

Q.       And it indicates verified.  Does that mean Google had some contact with that email address?

A.       Yeah, it means that the user would follow the steps to verify the account, if it showed up in a Google subscriber record as verified.

Q.       And did Google also provide the IP addresses they had for that particular subscriber account?

A.       Yes, Google would provide the standard IPs that we normally provide in our standard course of business, pursuant to a NCMEC report.

Q.       And in the report, does it indicate where Google became aware of the content?

A.       Yes.

Q.       And what does it indicate in the highlighted portion?

A.       Google became aware of the reported content which was stored in Google photos infrastructure.

Q.       And did Google also provide or upload a file as part of their CyberTip that was made?

A.       Yes.

Q.       How many files?

A.       One.

Q.       And did Google provide the filename as well as the hash value for the file?

A.       Yes.

Q.       And did Google provide any information as to who, if

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

anyone, looked at the file from Google?

A.        Yes.

Q.        And what is provided?

A.        A person at Google viewed the file to the extent necessary to confirm that it contained apparent child pornography concurrently to or immediately preceding the sending of the CyberTip.

Q.        So this particular file that was located on a Google platform was looked at by an employee of Google before the report was made to NCMEC?

A.        Yes, it was looked at by a Google reviewer that would confirm that it contained apparent CSAM.

Q.        Okay.  And then there was a categorization that's provided.  Was that provided by Google?

A.        Yes.

Q.        And what was the categorization?

A.        B1.

Q.        And what does that signify?

A.        Pubescent minor involved in overt sex act.

Q.        And from the source information provided, what was the date and time that the file was uploaded onto Google?

A.        This screenshot depicts May 21, 2021, but as I stated, our declaration sent the report on May 24, 2021.

Q.        And the reports are made once Google becomes made aware of child exploitation material on its platform?

A.        Yes.

Q.        And so anytime -- is it the general policy of Google that anytime it becomes aware of such materials that it makes the report to the National Center for Missing and Exploited Children?

A.        Yes.

Q.        And following their standard procedures, does it involve law enforcement at all before they make that CyberTip?

A.        No.

MS. VIACAVA:  One moment, please, Your Honor.

(Pause.)

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 4B that's been admitted into evidence.

BY MS. VIACAVA:

Q.        And based on the standard practice and procedures of Google, does Google require process or subpoenas, search warrants, things of that nature before content is given out to law enforcement?

A.        Can you repeat the question?

Q.        Based on Google's standard procedures, does Google wait until law enforcement can provide process, whether it be through a subpoena, search warrant, things of that nature, before content is given over to law enforcement directly?

A.        Yes.

Q.        And in this particular case, are you aware that a search warrant was ultimately obtained for those Google accounts?

A.        I'm aware, yes.

Q.        And they are the accounts that Google reported as part of the NCMEC tips?

A.        From this screenshot, it appears that they are the same accounts that I read out from the NCMEC tips.

Q.        And what is the date of this search warrant?

A.        This screenshot shows September 1, 2021.

MS. VIACAVA:  One moment, please, Your Honor.

(Pause.)

MS. VIACAVA:  I have no further questions for this witness, Your Honor.

THE COURT:  Cross-examination.

MR. DAVIDOW:  Thank you, Your Honor.

CROSS-EXAMINATION ON BEHALF OF THE DEFENSE

BY MR. DAVIDOW:

Q.        Afternoon.  Ms. Shrestha; is that right?

A.        Yes.  Afternoon.

Q.        Now, I had some questions.

You were asked about your declaration, which was Exhibit 10.  I wrote on it.

MS. VIACAVA:  It's in front of her.

MR. DAVIDOW:  It's in front of her?  Oh, okay.

BY MR. DAVIDOW:

Q.      So if you look about in the middle of the paragraph, it states here Google -- it's about three paragraphs down -- has a strong -- I'll put it up there.  Just lay it right on my exhibits.

        "Google has a strong business interest in enforcing its terms of service and ensuring services are free of illegal content."  Is that accurate?

A.      Yes.

Q.      So Google actually polices and enforces its own information that's on its, let's call it, ISP; is that fair?

A.      On Google services, yes.

Q.      And it says that if its products or services were to become associated and being abusive contempt, including CSAM, says users will stop using them.  Is that -- do you mean the account is shut down?  Is that sentence -- I didn't fully understand.

A.      No.  I believe this means that if Google becomes a platform that widely hosts CSAM, other users will not be interested in using Google.

Q.      Oh, okay.  And then it says here Google uses a proprietary hash tag technology to detect apparent CSAM.  Is that like some type of software?

A.      Yeah.  As I stated, Google uses proprietary technology.

118

Q.        Do you know what that is?

A.        I don't.  Proprietary technology that's created in the system in the usual course of business for Google.

Q.        Do you know whether or not it's a program or some type of software or even what it is, other than we'll just label it as proprietary technology?

A.        No.

Q.        It says here an offending file after it's viewed by at least one Google employee or a contractor.  What's the difference?  Says Google employee or a contractor.  What's the difference?

A.        So both are identified as a Google reviewer.  I don't know the exact specifications of the difference between the different types of employment.

Q.        So there's a possibility that Google would employ somebody outside of Google labeled as a contractor; is that what you're saying here?

A.        They've been labeled as a Google reviewer that is trained appropriately to identify CSAM.

Q.        Yes, but this does have the disjunctive -- I don't have my fingers on it.  Sorry.  At least one Google employee or a contractor.

A.        Yes, and they're both identified as Google reviewers.

Q.        And so do you have any other information on what the contractor would be versus the Google employee?

A.        No, as I stated, I wouldn't know the employment legal differentiation between Google employee or contract Google employee.

Q.        Now, this term, the Google reviewers that we have here, do you know how many Google reviewers there are?

A.        No.

Q.        Do you know how many contractors are employed?

A.        No.

Q.        Have you ever worked as a Google reviewer?

A.        I work on a team that handles a variety of different incoming legal process.

Q.        Have you specifically worked as a Google reviewer as would be identified in this paragraph here on Exhibit 10?

A.        As identified in this declaration as a Google reviewer, no.

Q.        So then it's fair to say that the Exhibits 3 that we've seen, and I'll go back to them, these NCMEC reports, that you've never filled one of these out?

A.        Yes.  And this is not -- the NCMEC report is not a report submitted by Google.  This is submitted by NCMEC.

Q.        The CyberTip.  I'm sorry.  You've never filled out the CyberTip that would get submitted to NCMEC?  I'm sorry if that was confusing.

A.        No, I haven't personally filled one out.

Q.        Do you know -- and let's just go to 3A then since

we're here.  If we look here at the very front of the -- I know it's a little small.  It's 3A.  It says here incident type, apparent child pornography, files not reviewed by NCMEC hash match.  Do you know what that means?

A.        No.

Q.        On page 3, you said here this uslawenforcement@google.com, you said that was an alias on your direct.  What do you mean by that?

A.        It's an email -- just I use the term alias interchangeably with email.  Usually we refer to as a larger email as alias.  So if law enforcement were submitting legal process, they would email uslawenforcement and a Google employee on my team could email also from that uslawenforcement alias or email.

Q.        So that email address isn't assigned to any one person?

A.        No.

Q.        Can there be automated responses from that email address?

A.        Yes.

Q.        Sorry.  I'm skipping around a little bit.  I want to go back here, back to your declaration, Exhibit 10, and this paragraph here that says, "When Google," middle paragraph, "discovers CSAM that appears to constitute child pornography as defined in 18 USC Section 2256," do you know if 18 USC Section

2256 is located in the United States criminal code?  It's okay if you don't know.

A.        I'm not sure.

Q.        Google provides a report to NCMEC via the CyberTip line in accordance with 18 USC Section 2258; is that accurate?

A.        Yes.

Q.        And you believe that's what Google does?

A.        Yes.

Q.        Now, I want to go a little bit further down.  Here, it says when Google's product abuse detection system encounters a hash that matches a hash in its repository of apparent CSAM, in some cases, Google automatically reports it to NCMEC without rereviewing the image immediately preceding the making of the report.  And I think we've identified it.  That means that Google will just automatically send a CyberTip line report to NCMEC?

A.        Yeah.  So it means that the hash or digital fingerprint matches another digital fingerprint of an offending image that a Google reviewer had previously reviewed.

Q.        And so no human ever sees those files, correct, before they get submitted as a CyberTip?

A.        So a Google reviewer, a human, would review an offending image and assign a hash.  That hash then becomes a part of Google CSAM's repository.  And then if another image's hash matches the hash of an already identified CSAM image, then

a report would be sent to NCMEC with that matching hash.  And so if a person or Google reviewer did not review it, it just means that, at the immediate time of sending the NCMEC report, a Google reviewer did not immediately or concurrently review it.

Q.        Now, I believe there was another exhibit that was up that said that Google has 1,997,505, let's call them, hash matches that were sent to NCMEC; is that correct?

A.        I don't remember the exact number, but we've produced the transparency report records pursuant to legal process, and that's the number stated, then yes.

Q.        So then just to kind of put this together, there's the possibility, at least right now, of almost 1.9 million individual hash files floating around for which, if Google's, let's call it, infrastructure identifies this hash match, then that will automatically trigger a report to NCMEC?

A.        Can you repeat the question?

Q.        Yes.  So that means that Google has previously identified and sent to these hash matches, like you've said, NCMEC almost 1.9 -- almost 2 million files; fair?  1.99?

A.        I don't -- can -- without having the information in front of me, it's hard for me to answer this.

Q.        Sure.

A.        The report would outline how many NCMEC reports we've sent.  So, like, in 2021, it was 870,319.

Q.        Maybe it's the number.  Here's 9A.

So this says here on 9A, 1.997505, almost 2 million -- it says here total hashes contributed; correct?

A.        Yes.

Q.        So go back to my question.  If one of these 1.997505 hashes somehow is automatically identified by this proprietary information, proprietary -- I don't know -- software or whatever.

A.        Technology.

Q.        Technology, sorry.  That that will trigger a NCMEC report -- CyberTip, excuse me -- from Google without anybody reviewing it?

A.        This number doesn't explicitly state that.

Q.        So Google has the, let's call it, system in place to not rereview already identified hashes; correct?

A.        Right.  Already identified hashes, that's a digital fingerprint.  Google's computers can automatically recognize that.

Q.        And from that number, Google's computers have already recognized close to 2 million hashes?

A.        It would say on the transparency report, but that doesn't differentiate between if a user flagged it, a Google reviewer looked at it, or if it was a hash match.  There are different ways that Google uses to combat CSAM.

Q.        Sure.  And one of those being a report, a CyberTip

being submitted without review?

A.          One of those being a report submitted because the hash matches a previously reviewed hash.

Q.          Now, let's see.  And in fact, go back to your declaration, that at least is the case here.  I'm sorry, for purposes of the record, 10.  Government's Exhibit 10.

It says here on the bottom of the page this CyberTip line report reflects that two files were attached to the report and Google indicated that a Google reviewer had reviewed one of the files immediately before submitting the report, while it did not review the other immediately before submitting the report.  So one was looked at, one was not?

A.          So that term the file not viewed means only, and it's listed in the declaration, that a Google reviewer did not review that file concurrently with or immediately preceding the report and it means that the file's hash matched the hash's in Google's repository of apparent CSAM.  So the underlying image for that hash still would have been reviewed by a Google reviewer before that hash was even added to Google's repository of hashes.

Q.          And how do you know that?

A.          That's in Google's normal course of business.

Q.          And but as we sit here today, you don't know who reviewed the one that's being reported right now; correct?

A.          The CyberTip?

Q.        Yes.

MS. VIACAVA:  Your Honor, again, we've already addressed this issue as to relevance.  We don't need a name. We've got an individual from the company that's providing information regarding how they do their procedures.  This is also something that took place without any law enforcement involvement.  It's something that took place within the company and is part of their procedures and I would argue that this is not relevant as to who the individual was.

THE COURT:  Sustained.

BY MR. DAVIDOW:

Q.        You don't know who the individual was that would have submitted the hash tag to begin with?  Into the repository?

A.        No.

MS. VIACAVA:  Your Honor, again, I would argue, again, relevance.

THE COURT:  Move on.

BY MR. DAVIDOW:

Q.        Now, we go to Exhibit B.  Or 3B, excuse me.  And you had stated a couple things on 3B here.  Let's look at it.

That this email address was verified; correct?

A.        I stated that the term -- what the term verified means in a Google record.

Q.        Now, if we go -- actually, this one also has a phone number attached to it; correct?

126

A.      Yes.

Q.      How does the phone number get attached to the email?

A.      A user when they sign up for a Google account can input a phone number.

Q.      And go here.  These IP addresses that are right below it, do these IP addresses mean that every time it says here log-in, that that's verified log-in or that that was just a verified account and it's being logged into?

A.      No.  And this is not a NCMEC record so I don't know what they would say, but --

Q.      This is a CyberTip.  This is one of the CyberTips that Google would have sent, it's not --

A.      Well, NCMEC produces the CyberTip.

Q.      What do you mean NCMEC produces the CyberTip?

A.      We would send the CyberTip to NCMEC and then NCMEC compiled that report.

Q.      So is this not the CyberTip that you sent?

A.      The information of the reporting number is the CyberTip, but as it's seen -- as it says, National Center for Missing and Exploited Children, that would be their record.

Q.      So do you have a record that's different than this one regarding that CyberTip?

A.      No.  I just can't speak to a record that Google didn't produce.  This is a NCMEC report.  But a log-in -- the verified status only applies to where it says next to it like

email, phone number.

Q.        In Google offices, how does one send the CyberTip to NCMEC?

A.        I don't know.

Q.        And you're the custodian of records; correct?

A.        Yes, I'm custodian of records.

Q.        And so you don't know, let's call it, what the format paper or computer, window, or process or anything is for which NCMEC would get information to generate this CyberTip?

A.        I didn't say I didn't know anything.  But I don't know -- you said how.

Q.        Yes.

A.        How -- what was your original question?

Q.        How does one at Google submit their report to the CyberTip to NCMEC?

A.        I don't know.

Q.        I want to go back to your declaration.

If you said here, page 2 of the declaration, Google provided to NCMEC the information in CyberTip report, do you see -- I'm sorry, I can't -- I don't know where this is sometimes because I'm looking at this.

Okay.  Google provided NCMEC the information in CyberTip report 90034851.  The document we were just looking at may or may not have been, but this is it.  It's 3A.  This is 90034851.

A.        Yes.

Q.        Okay.  So when you're writing this declaration, where is the information coming from for this declaration?

A.        Our internal tooling.

Q.        Your internal tooling?

A.        Yes.

Q.        What is that?

A.        Google's internal tooling.

Q.        Okay.  So the internal tooling, is that a program, is that a piece of paper?  What is the internal tooling?

A.        It's the internal tooling that Google uses to respond to requests.

Q.        Is this some type of software?

A.        It's Google's internal tooling.

Q.        Have you ever seen it?

A.        Yes.

Q.        How do you access it?

A.        Using my Google computer.

Q.        And so have you ever seen anyone submit a CyberTip to NCMEC with this internal tooling?

A.        I've worked in this internal tooling and worked --
no.

Q.        So how do you review the information in the internal tooling to generate the declaration that you did?

A.        I have access to the internal tooling and can review

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

the records.

Q.        And do you have any information on how those records are generated within your access?

A.        In a normal course of business.

Q.        When you say in your normal course of business, I mean, in the normal course of business, is it done by a human or in the normal course of business is it done automatically by a computer?  Do you know?

A.        Yes, I know.  What's the question?

Q.        Yes.  You said in your normal course of business, when you're accessing the tooling --

A.        Yes.

Q.        -- to review information to fill out this declaration --

A.        Yes.

Q.        -- that you can review the information that's put in the normal course of business.

My question is in the normal course of business, how is it physically generated into this tooling system?  Is it an individual that does it?  Is there a list of log entries as to who put it in?  Because, see, I don't understand what you're looking at and that's what I'm trying to figure out.

A.        So I'm able to access Google's internal tooling where I'm able to review information that is necessary to compile this declaration.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        Is this software that's different from other software in Google?

A.        As I stated, it's tooling that is used internally by Google.  It's not an external tool.

Q.        But as long as you have some type of log-in, you could access this from anywhere?

A.        Me personally?

Q.        You or somebody with credentials.

A.        Google's internal tooling that I use in my normal course of business I can access on a secure computer with credentials.

Q.        Anywhere?

A.        No.

Q.        What do you mean not anywhere?

A.        In secure locations.

Q.        So there's only certain facilities that you can go to for which you can access this internal tooling information?

A.        I would be able to access this information in my office, for example, at a Google headquarter.

Q.        Could you access it at a Starbucks?

          MS. VIACAVA:  Your Honor, I gotta object to the relevance as to the electronic database that Google may maintain.  It doesn't appear relevant to the motion that's before the Court.

          THE COURT:  I think he's just trying to figure out

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

how the process works.

MR. DAVIDOW:  That's all.

BY MR. DAVIDOW:

Q.          Is it accessible at a Starbucks, let's say, by you. Make it simple.  By you, could you access it on your Google computer at a Starbucks, if you had internet?

A.          If I felt that the location was secure and I had my work computer and a secure Google provided internet hotspot, I could, in theory, be able to use -- to do my daily job, which would include tooling and the standard course.

Q.          And does this tooling system generate saved files that could be accessed as well?

A.          I don't understand the question.

Q.          Yeah, certainly.  You could, like, let's call it, Google drive.  I can go to a file saved on Google drive; right?

A.          Yes.

Q.          Okay.  Does this system, this Google tooling, have some type of saved access where you can go back into and review certain things that would have been done relating to this CyberTip reporting?

A.          So using my internal tooling, I'm able to see information associated with the CyberTip sent to NCMEC.

Q.          Now, you were asked a question, oh, that these reviewers that we talked about, that they were specialized -- these individuals had specialized training to review items on

the platform.  You recall being asked that?

A.        Yes.

Q.        Do you know what that is, the specialized training that they receive?

A.        I know that there is a training program, including trainings from Google employees and our in-house counsel.

Q.        Have you ever gone through it yourself?

A.        Yes.

Q.        So you've gone through the robust training necessary to be a Google reviewer?

A.        No, I've gone through trainings -- the question was have I gone through trainings from Google employees and in-house counsel, and that's why I answered yes.

Q.        Okay.  I want to go to 3B because I realize you said that this is not provided, this was provided by NCMEC, but my other question here is on 3B, if we're looking at this, do you know what these geo lookups are?

A.        No.

Q.        And so this would not have been submitted by Google?

A.        I don't know, but I see T-Mobile as the ISP and org.

Q.        And so, at least in what we're looking at in 3B, this geo lookup information, this was not something that you would have had within your tooling where you reviewed the CyberTips in order to submit the NCMEC report?

A.        I don't know.

Q.     Is there somebody that would know?

A.     Well, if the organization is T-Mobile, I couldn't speak to a T-Mobile record.

Q.     So if we look at this IP address here, this 2670FB90 -- right -- and we go back to this first page here with this email, and you said it was verified on direct and that there was a number associated with it, it's the same IP address, isn't it?

A.     I would need to do a side-by-side comparison.  It's a long string of numbers.

Q.     Yeah.

A.     And --

Q.     Here.  Some are similar, if not the same, to these, let's see, addresses here, are they not?

A.     And so we would also not -- we would never just compare records with our -- like a blind eye.  We would run a script or something to ensure that something matched, but...

Q.     So a script is a type of computer program; correct?

A.     Uh-huh.

Q.     You have to say yes.  I'm sorry.

A.     Yes.

Q.     It's just they're taking down words; so...

A.     Yeah.

Q.     Okay.  And so what you're saying is that Google would not have submitted these geo locates because you would have run

a script instead of just blindly staring at the numbers?

A.      No, I was saying just right here, I can't confidently say that the IPs match just by looking on a screen for a short period of time.

Q.      So if I go to 3A, there's also some of these IP addresses as well.  And then the IP addresses are provided in this section of the report, but do you have any way of, I mean, identifying what those are?

A.      I don't know what this is, no.

Q.      Now, when you submit something, your CyberTip submits something to NCMEC, does Google ever get anything back from NCMEC?

A.      I don't know.

Q.      Do you know if there's anybody that would know?

A.      I'm not sure.

Q.      Do you know why in -- let's go 3A -- Exhibit 3A that there is no cell phone associated with this gmail, this verified gmail, but there's cell phones associated in 3B?

A.      No, I don't know why in this CyberTip, but in a Google subscriber file, a user can choose -- or in a Google -- just when you sign up for a Google account, a user can choose to input a phone number, if they'd like to.

        MR. DAVIDOW:  Can I have one second, Your Honor?

        THE COURT:  You may.

        MR. DAVIDOW:  Thank you.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

(Pause.)

MR. DAVIDOW:  One last question.

BY MR. DAVIDOW:

Q.        Let's just take 3C.  Just comparing something in 3A and 3B to see if you can answer it.  Give me one second.

(Pause.)

BY MR. DAVIDOW:

Q.        So I'm showing you what's a portion of 3C.  And it says here on 3C, it gives the filename, the MD5, the hash tag, and then it says did reporting ESP view entire contents of file uploaded.  No information provided.

Do you know whether there's information in the Google tooling that would say whether or not information was provided there?

A.        I believe the information is provided in the additional information.

Q.        Do you know why it's provided in the additional information here and not just yes here where it says no information provided?

A.        Because for a video, a Google reviewer is only required to watch the extent of the video to confirm that there is indeed CSAM in that video.  So Google would review the video to the extent necessary to confirm that it was there, but it did not populate through because it wasn't watched in full end to end, only as much to confirm CSAM in the video.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        And this is -- you could tell that this is a video file?

A.        From the cyber -- the two CyberTips, in the last paragraph of my declaration identify it as video.

Q.        In your last -- which one?

A.        In the declaration, CyberTips 90533145 and 91101569, the CyberTip reports that there was videos included in that report and that the person viewed the file to the extent necessary.

Q.        And that would have been something that you pulled from your tooling is correct; right?

A.        Yes.

Q.        Okay.  Now, if I go to A, 3A, here, under 3A, it says the same one and it says yes.  Do you know why that that's there without the additional information?

A.        It means that this file was reviewed immediately upon sending that report to NCMEC.  So this would be an image rather than a video.

Q.        And do you have any reason to know why one would be sent with a yes or another would be sent with a no, however the individuals, let's call them the reviewers, input it?

A.        So if the hash and the corresponding image had never been reviewed and it was a image, then a Google reviewer would review it immediately or concurrently upon sending it to NCMEC, which would generate a yes.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

If it is video, a Google reviewer would only review it enough to confirm that there was CSAM, which was why it wouldn't generate a yes as clearly, but would include additional information to explain. And then if a file -- if the hash matched a hash's image that had previously been reviewed by a Google reviewer, that is another example where the ESP wouldn't just be marked as yes.

Q.    And all the protocols and policies that you've just said how they go about filling this out, are they contained somewhere at Google?

A.    Yes.

Q.    And what are they contained in?

A.    The policies are contained within Google's internal CSAM policies.

Q.    About how it reports the CyberTips and how the reviewers review it and how they report?

A.    Yes, about the classification that's mentioned in these tips here.

Q.    I didn't mean the classification, but I don't need to belabor the point.

MR. DAVIDOW:  I don't have any further questions. Thank you, Your Honor.

THE COURT:  Redirect?

MS. VIACAVA:  Just briefly, Your Honor.

REDIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT

BY MS. VIACAVA:

Q.          Defense counsel asked you how CyberTips are made. Are CyberTips made from an employee at Google online to the National Center for Missing and Exploited Children?

A.          Yes, or through the process.  There's a few ways that a CyberTip could be sent or through the process where a hash matched.  And so the -- like the system would be able to generate that CyberTip.

Q.          Okay.  Well, there's only -- in looking at the three CyberTips that were done in this particular case --

A.          Yes.

Q.          -- the one that indicated that a file was viewed entirely, Government's Exhibit No. 3A and 3B was the only one where the second file indicated no; is that correct?

A.          Yes.

Q.          So the first file was viewed in its entirety?

A.          Yes.

Q.          So the fact that one of the files contained on there had that information, based on your training and experience and procedures with Google, a human from Google would have made the CyberTip; correct?

MR. DAVIDOW:  Objection, Your Honor.  I wasn't allowed to ask that question.  All I said was is there a name contained on that person.  The objection was sustained.

THE COURT:  Right, and it doesn't matter who the

person -- what the person's name is.  She --

MR. DAVIDOW:  Well, that's what I -- I wasn't asking the name.  I just said is there a name, is there an identification, and it was sustained.  And then now to be able to open the door to the question I wasn't even able to ask without me having the opportunity to ask any further questions really is unfair.

THE COURT:  Overruled.  Go ahead.

BY MS. VIACAVA:

Q.      Looking at Government's Exhibit No. 3A, would this have been a CyberTip that was made by an employee at Google?

A.      Yes.

Q.      Now, defense counsel asked you about IP lookups and whatnot that are contained in the NCMEC report.  That is not something that Google routinely does, they don't look at where the IP addresses come from; is that correct?  They would just provide the IP addresses to NCMEC and let NCMEC handle it from there?

A.      Yes.

Q.      And that's further contained in the transparency report in which subscribers are told that reports were made to NCMEC and NCMEC could report to law enforcement?

A.      Yes.

Q.      So as part of the report process, Google does not look for or obtain where those IP addresses are coming from,

they just report what they capture; correct?

A.      Yes.

Q.      And there was much discussion about internal tooling. Essentially, that's an electronic database that Google maintains; correct?

A.      Yes.

Q.      And you were able to check and access those records as part of a records custodian for the business?

A.      Yes.

Q.      And the records are made at or near the time that they're -- Google becomes aware of such instances such as CSAM being found on their service?

             MR. DAVIDOW:  Objection.  Leading.

             THE COURT:  Sustained.

             MS. VIACAVA:  One moment, please, Your Honor.

             (Pause.)

             MS. VIACAVA:  No further questions for this witness, Your Honor.

             THE COURT:  Do you have any follow-up?

             MR. DAVIDOW:  Just one and it's --

             THE COURT:  Go ahead.

             MR. DAVIDOW:  -- for the purposes of the record.

   RECROSS-EXAMINATION ON BEHALF OF THE DEFENSE

BY MR. DAVIDOW:

Q.      I'm not asking you because the Court's already

sustained an objection.

THE COURT:  Okay.  Just go ahead and ask your question.

BY MR. DAVIDOW:

Q.        In this tooling file, when you were asked that someone from Google reviewed or sent in the CyberTip, is there a name associated with how that CyberTip is sent?  I'm not asking for the name.

A.        I don't know.

MR. DAVIDOW:  No further questions.

THE COURT:  May this witness be excused?

MS. VIACAVA:  Yes, Your Honor.

THE COURT:  You may step down.  You are excused.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Do you want to hand the exhibit to the prosecutor on the way out, you can.

(Witness is excused at 2:35 p.m.)

THE COURT:  Call your next witness.

MS. VIACAVA:  Your Honor, at this time, the government would call Task Force Officer Katrina Lee to the stand.

(Pause.)

THE COURT:  Please step forward, raise your right hand, and she'll swear you in.

THE DEPUTY CLERK:  Do you solemnly swear or affirm that the testimony you're about to give in the case that is now before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURTROOM CLERK:  Can you please state your full name and spell your last name for the record.

THE WITNESS:  Katrina Lee.  L-E-E.  But when this case took place, my last name was O'Brien.

THE COURTROOM CLERK:  Thank you.  You can have a seat.

THE COURT:  I was just going to say it looks like there's eyeglasses up there.

THE DEPUTY CLERK:  I'll run them out.

(Pause.)

MS. VIACAVA:  If I may have just one moment, I misplaced my glasses.  One moment.

(Pause.)

MS. VIACAVA:  Thank you.

Thereupon,

KATRINA LEE,

Having been called as a witness on behalf of the Government, and having been first duly sworn by the Courtroom Clerk, was examined and testified as follows:

(Time noted:  2:37 p.m.)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT

BY MS. VIACAVA:

Q.        Good afternoon.  How are you employed?

A.        I'm a police officer with the Fort Myers Police Department.

Q.        And how long have you worked for the Fort Myers Police Department?

A.        Almost 17 years.

Q.        And are you currently part of a task force?

A.        Yes.

Q.        What is the name of the task force?

A.        I'm a part of the NCMEC task -- or the ICAC task force and then I'm also a TFO with HSI.

Q.        And when you talk about ICAC, what does that stand for?

A.        Internet crimes against children.

Q.        And how long have you been a part of that task force?

A.        Five-and-a-half years.

Q.        And how long have you been involved or working at a task force with Homeland Security investigations?

A.        Since August of 2020.

Q.        Okay.  And have you received any particularized training regarding child exploitation investigations?

A.        Yes.

Q.        Briefly, what type of training have you received?

144

A.      With the ICAC, you take like operational standards and procedures when you're investigating these type of cases, interview techniques, online ads, strategies, innovative approaches to investigating these, classes about what IP addresses are, how to send legal process to different service providers.

Q.      And while working on this particular task force, have you had occasion to review NCMEC CyberTip reports?

A.      Yes.

Q.      How frequently do you review such CyberTip reports?

A.      Probably almost daily.  Like, last year, I had 200 alone that were assigned to me just at my agency.

Q.      Okay.  And were you involved in the CyberTips involved in this particular case?

A.      Yes.

Q.      There were approximately seven CyberTips and two supplemental reports; would that be accurate?

A.      Yes.

Q.      Involving two different internet service providers?

A.      Yes.

Q.      And how did you come into contact with those reports?

A.      So we have -- through the internet crimes against children, there's a database that they're assigned out to the different investigators.  So I get an alert, I go onto that portal, and then I receive the CyberTip.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        Okay.  And how is it determined where the CyberTips can be sent?  What area of the country?

A.        From the IP addresses that are in them and where they -- the area that they geolocate to.

Q.        And who provides that geographic location and determines where the tips are being sent to?

A.        It's provided in the NCMEC -- in the CyberTip, but the main office for my ICAC is in Broward so then Broward sends it out to the affiliate agencies.

Q.        Essentially, from your training and experience regarding the CyberTips, are you familiar with internet service providers providing CyberTips to National Center for Missing and Exploited Children?

A.        Yes.

Q.        And from there, is it the National Center for Missing and Exploited Children that then determines what area of the country to send the tips to?

A.        Yes, they send it to the Broward ICAC.  And then, in turn, they send it out to their affiliate agency.

Q.        From the information provided from the CyberTip from the internet service provider, do they determine what area of the country the suspect might be located and then send it to that area?

A.        Yes, it could be sent to multiple depending on where the IP address is going.

Q.        Okay.  So, in this case, based on information that National Center for Missing and Exploited Children had, it was sent to this area?

A.        Yes.

Q.        Okay.  And you are the individual that received those seven tips and two supplemental reports?

A.        Yes.

MS. VIACAVA:  At this time, I would seek to publish Government's Exhibit No. 1A that's been admitted into evidence.

Q.        For instance, is this one of the CyberTips you reviewed in this particular case?

A.        Yes.

Q.        When you receive such CyberTips, what are your procedures or what do you do with the CyberTips?

A.        The first thing I look at is the incident type of what the reporting because that could be different.  In this case, it what was apparent child pornography.

THE COURT:  Can you scoot up to the microphone just a little bit.  Or maybe move it down.  Thank you.

You may proceed.

BY MS. VIACAVA:

Q.        And after looking at the incident type, do you also look at what entity or -- made the CyberTip?

A.        Yes, I go through it section by section.  So there will be information about the submitter, information that then

underneath that the company is providing.

Q.        Okay.  So, in this instance, looking at Government's Exhibit No. 1A, who was the submitter of the CyberTip?

A.        Yahoo, Inc.

Q.        And you indicated that you routinely review CyberTips.  Have you had occasion to review other CyberTips made by Yahoo?

A.        Yes.

Q.        And is that a company that you're familiar with making CyberTips?

A.        Yes.

Q.        Besides looking at the incident type and who provided the information, what other information do you review routinely with CyberTips?

A.        There will be incident information as far as the date and the time, subscriber information of the account that they're reporting.

Q.        So looking at Government's Exhibit No. 1A, for instance, does it provide you with that information in terms of the incident type as well as the incident time?

A.        Yes.

Q.        And then what other information are you used to reviewing?

A.        This one actually provided email information about the to and from for, like, the sender.  But if you scroll down

more, there's more subscriber information that it gets to.

Q.        Okay.  And is this all information you review when you receive the CyberTips?

A.        Yes.

Q.        And you were the individual that received all seven of those plus the two supplementals?

A.        Yes.

Q.        And does this NCMEC CyberTip come in different sections?  A section A, B, C, for instance?

A.        There's different titles for each section.

Q.        Okay.  And based on your training and experience, who provides the information contained in section A?

A.        They're not, like, sectioned out.  They're just different -- there's different titles.  Like suspect, there's the upload information, additional information.

Q.        Well, let me go back to this particular page.

Looking under section A, the reported information, based on your experience, who provided the reported information?

A.        The electronic service provider provides all the information that's contained within the CyberTip.  There's also a section towards the bottom where NCMEC will provide information if they viewed or reviewed files.

Q.        Okay.  So just looking at subsection A, is that something that you would normally review in looking at each

CyberTip?

A.        Yes.

Q.        And is that something that you recall doing in each of these cases?

A.        Yes.

Q.        In each of the CyberTips involved in this case?

A.        Yes.

Q.        And after reviewing the suspect information and subscriber information that was provided, what did you then review from the particular CyberTip?

A.        In this instance, I think the next thing that's there is the upload information about the files that were being reported.

Q.        So along with the tip, are you used to having files provided as part of the CyberTip?

A.        Yes.

Q.        And where do those files generate from?

A.        The electronic service provider.

Q.        Okay.  So, in this instance, looking at Government's Exhibit No. 1A, for instance, does it tell you how many files were uploaded with this particular CyberTip?

A.        Yes.  Six.

Q.        Okay.  And do you review the other information that's contained?

A.        Yes.

Q.          In terms --

A.          I look at the -- if the electronic service provider has also viewed the file that they're reporting, what other -- if they usually sometimes will have the IP upload information, what the -- it's been categorized from the hash value, if it's known like image that's in their system.

Q.          Okay.  So, in this instance, looking at the CyberTips that were provided from Yahoo, for instance, would you agree there were four reports provided by Yahoo?

A.          That sounds correct.

Q.          Okay.  I can --

A.          I know there was nine total.

MS. VIACAVA:  May I have a moment -- or may I approach the witness?

THE COURT:  Yes.

(Pause.)

BY MS. VIACAVA:

Q.          I have now handed you what's been admitted in evidence as Government's Exhibit 1A through 1D.  Are those the CyberTips that you reviewed in this particular case?

A.          Yes.

Q.          And are those the CyberTips that were sent or that were reported by Yahoo?

A.          Yes.  All four of these are from Yahoo.

Q.          Okay.  And in looking at the CyberTips provided by

Yahoo, did they provide information as to each uploaded file in each CyberTip?

A.       Yes.

Q.       And looking at the information provided by Yahoo in each of the CyberTips, do they indicate whether or not they looked at the file in its entirety as to each file contained or attached to the CyberTip?

A.       Yes, they did.

Q.       And what was the response when asked if they looked at the file in its entirety?

A.       Yes.

Q.       And that was for each file?

A.       Yes.

Q.       And looking at the information provided, when it indicates that the ESP viewed the entire contents of the uploaded file, what did that mean to you or what did that cause you to believe?

A.       That, at that point, I was able to view the image as well.

Q.       And looking at CyberTip that's admitted into evidence as Government's Exhibit No. 1A, for instance, did you also view or review the part of the report that indicates the image categorization by the ESP?

A.       Yes.  So under the uploaded file information, they will have it categorized.  These were categorized as A1.

Q.        And are you aware with what A1 designates?

A.        I am, because on page 7, it has the definitions of what each category means.  So A1 would be a prepubescent minor and engaged in a sex act.

Q.        And as you've indicated, page 7 of Government's Exhibit No. 1A, this is information contained under section B provided by NCMEC?

A.        Yes.

Q.        And in addition, on this particular section, does it also provide information as to the suspect's geographic lookup?

A.        Yes.

Q.        Can you please read what's provided in the report as an explanation?

A.        "When a reporting ESP voluntarily reports an IP address for the suspect, NCMEC's system will geographically resolve the IP address via a publicly available online query. The results of this lookup are displayed."

          Do you want the rest of it?

          "Geolocation data is approximate and may not display a user's exact location.  Please be aware that the geolocation information provided is not exact, but is providing reliable estimate of location based on IP addresses voluntarily provided by the reporting ESP."

Q.        So, from looking at the NCMEC report, NCMEC acknowledges that they try to look up the IP addresses to

153

figure out where the suspect may be located?

A.      Yes.

Q.      And based on your training and experience, is that what helps NCMEC determine what law enforcement agency is to provide the NCMEC report to?

A.      Yes.

Q.      Essentially, based on your training and experience, is NCMEC a clearinghouse for the CyberTips?

A.      Yes.

Q.      And under the geo lookup for the suspect, does it provide you with where they believe the IP addresses are coming from?

A.      Yes.

Q.      Is there any other portions of the NCMEC report that you review when they come to you?

A.      If the files were viewed or not by NCMEC is another one, a section that I'll look at, but, essentially, I look through every section and review the entire report.

Q.      And when you refer to whether or not NCMEC looked at any of these files, are you referring to section C?

A.      Yes.

Q.      That is additional information provided by the National Center for Missing and Exploited Children?

A.      Yes.

Q.      And what is generally contained in section C?

154

A.       If they -- what they viewed, what they didn't view, the files, and they'll separate them out, hash match information -- the hash value will be in there, the filename.

Q.       Okay.  And so in this section, is this the section that will indicate whether or not NCMEC employees looked at any of the images?

A.       Yes.

Q.       So in looking at Government's Exhibit No. 1A, does it provide information as to whether or not any files were located, or any files were viewed by NCMEC staff?

A.       Yes, one.

Q.       Okay.  And then does it provide any information that it has garnered regarding any other files?

A.       Yes, the other five files were not viewed by NCMEC. I'm assuming because the hash match.

Q.       And, well, actually, you don't need to assume.

A.       Yeah.

Q.       It provides you with information.

A.       Yeah, it's there.

Q.       Well, under the files that it lists, what is provided under files not viewed by NCMEC?  What does it state in this particular report?

A.       No information concerning the content of the uploaded files are other than information voluntarily provided in this report by the reporting ESP or noted in section B of this

report.

Q.        And so they provide law enforcement with the
information as to which file they did, in fact, view?

A.        Yes.  They viewed one.

Q.        Okay.  And in this particular instance, after
reviewing the report, does it provide information as to how the
ESP became aware of these particular files?

A.        These ones in this report were from the email, Yahoo
email.

Q.        And it provided dates as to when the emails were sent
or received?

A.        Yes.

Q.        So after reviewing this report, what action did you
take?

A.        I submitted legal process subpoenas and got in
contact with Agent Randall.

Q.        Let me step back.

          They have files attached to them.  You said there
were six in this particular report?

A.        Oh, as far as viewing -- yeah, I viewed the files.

Q.        Okay.  So after you reviewed the report, did you then
view the files?

A.        Yes.

Q.        And they were attached to -- as part of the report?

A.        Yes.

Q.    Why did you review the files?

A.    Because the electronic service provider had indicated that they had viewed all of the files.

Q.    Okay.

A.    And that they were child pornography.

Q.    And based on the categorization, before you viewed the file, did you have reason to believe that they contained child exploitation material?

A.    Yes.

Q.    And after viewing the files, were you able to confirm that they did, in fact, contain child exploitation material?

A.    Yes.

Q.    What action did you take from there?

A.    At that point, I would have served legal process on some of the Yahoo email or the IP addresses and gotten that information.

Q.    Okay.  So when you refer to legal process, you're talking about administrative subpoenas sent?

A.    Yes, yeah.

Q.    And what was the purpose of administrative subpoenas?

A.    To determine the location for the suspect.

Q.    As well as the identity of the suspect?

A.    Yes.

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 1B that's been admitted into

evidence.

Q.        Did you follow the same process with this particular NCMEC report as well?

A.        Yes.

Q.        Did you review all the same information --

A.        Yes.

Q.        -- contained in the report?

A.        Yes.

Q.        In looking at Government's Exhibit No. 1B and, in fact, all of the Yahoo reports, did they indicate whether or not they had looked at the entirety of the files as to each attachment?

A.        Yes.

Q.        And did you have an occasion to review the suspect information?

A.        Yes.

Q.        Did you have an occasion to review the section B provided in the NCMEC report as to the geographic location of IP addresses reported?

A.        Yes.

Q.        Did you have an occasion -- and in this particular report, Government's Exhibit No. 1B, how many files had been uploaded by Yahoo?

A.        217.

Q.        And did they provide information as to all 217?

A.        Yes.

Q.        And did they indicate whether they looked at each and every one of those attachments?

A.        Yes, they did.

Q.        And what did they report?

A.        Yes, that they did.

Q.        Okay.  Looking at --

MS. VIACAVA:  One moment, please, Your Honor, trying to get to the right page.

(Pause.)

BY MS. VIACAVA:

Q.        Looking at page 64 of Government's Exhibit No. 1B, did looking at Government's Exhibit No. 1B on this particular page, page 64, does it provide information regarding any of the files that were added by NCMEC?

A.        Yes.

Q.        Can you read the part that's highlighted?

A.        Uh-huh.  "Automated file categorization is based on NCMEC's review of uploaded files in this report or hash match of one or more uploaded files to visually similar files that were previously viewed and categorized by NCMEC at the time a PDF of this report was generated."

Q.        And so, looking at this, NCMEC provided additional information as to each of those 217 files?

A.        Yes.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        And did that information include characterization that NCMEC believed those files to have?

A.        Yes.

Q.        And in there, what designations of apparent child pornography, what does that signify to you?

A.        That it's child pornography.

Q.        And what about when it says CP unconfirmed?

A.        It has the potential to be child pornography.

Q.        And are those designations on each of the files contained on -- beginning on page 64 all the way through 69?

A.        Yes.

Q.        In addition, did you have an occasion to review the section C for this particular report --

A.        Yes.

Q.        -- contained on page 70?

A.        Yes.

Q.        Did NCMEC provide any information as to whether or not they viewed any of the 217 files?

A.        They did.

Q.        What did they report?

A.        They viewed -- there's files that they viewed on page 70 and the beginning of page 71.  And then 71 and the continuing pages are the files that they did not view.

Q.        Okay.  But there were multiple files that they acknowledged that they viewed themselves?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

160

A.        Yes.

Q.        And when they indicate NCMEC staff viewed the following uploaded files, based on your training and experience, would that be an individual that viewed it?

A.        Yes.

Q.        So, in this particular report, in addition to individuals at Yahoo reviewing the files, some of the files were reviewed by NCMEC before it was reported to you?

A.        Yes.

Q.        Looking at Government's Exhibit No. 1C that's been admitted into evidence, how many files were contained in the CyberTip provided by Yahoo?

A.        Ten.

Q.        And -- oh, I'm sorry.  Going back to 1B, after seeing that -- or after looking at the CyberTip report, did you take any further action after reviewing the CyberTip?

A.        Yes, I viewed all 217 files.

Q.        And why did you view the files?

A.        Because they had been viewed by the electronic service provider and it indicated that there was child pornography.

Q.        And so did you have a belief that that's what you would find?

A.        Yes.

Q.        And in looking at those 217 files, were you able to

confirm they observed the nature of what was depicted in those files?

A.      Yes.

Q.      And what was the nature of those files?

A.      They were child pornography.

Q.      Looking at Government's Exhibit 1C, did you review the contents of this entire file?

A.      Yes.

Q.      Did you review -- how many files were uploaded with the CyberTip?

A.      Ten.

Q.      And did you have the same inquiry, did you follow the same line of inquiry to determine whether or not it indicated the files had been reviewed by the ESP?

A.      Yes.

Q.      And what did Yahoo indicate as to these ten files?

A.      They viewed all of them.

Q.      And was there also, on some of the files, was there also categorization that was provided?

A.      Yes.  Uhmm -- yes.

Q.      And on the areas where they answered what it was categorized, what was the designation?

A.      A1, which would be a prepubescent minor engaged in a sex act.

            MS. VIACAVA:  At this time, the government would

publish Government's Exhibit No. 1C that's been admitted into evidence.

Q.      Did you have an occasion to review the suspect information on this report as well?

A.      Yes.

Q.      So is this one of the instances where they indicated whether they looked at the entire file and what the categorization was?

A.      Yes.

Q.      In addition to reviewing section A, did you have an occasion to review section B in the report that begins on page 9?

A.      Yes.

Q.      And on the portion provided from NCMEC, what information is contained regarding the files?

A.      The categorization of them.

Q.      And from the information provided from NCMEC, what was the categorization of these files?

A.      Apparent child pornography and CP unconfirmed.

Q.      And looking at section C contained in the report that begins on page 12, did you have an occasion to review this section as well?

A.      Yes.

Q.      And did it provide information as to whether or not any of the files reviewed by NCMEC staff?

A.          Yes, three of them had been reviewed by them.

Q.          So it provided the filename as well as that information that they viewed it?

A.          Yes.

Q.          And did they provide information as to the rest of the files, the others?

A.          They provided that they didn't -- that they didn't view them.

Q.          And after reviewing this particular file, did you take any action?

A.          Yes, I reviewed the image files.

Q.          And why did you review the image files?

A.          Because the electronic service provider had viewed them and they were categorized as child pornography.

Q.          And did you have a belief that the files would contain child pornography?

A.          Yes.

Q.          Looking at Government's Exhibit No. 1D that's been admitted into evidence --

          MS. VIACAVA:  At this time publishing Government's Exhibit No. 1D.

Q.          Did this report also contain information regarding the suspect?

A.          Yes.

Q.          And did it provide information on page 4 as to how

many files were uploaded with the CyberTip?

A.    Yes.

Q.    How many files had been uploaded?

A.    Eight.

Q.    And did you review the file information as to each of those eight files?

A.    Yes.

Q.    And did that information include whether or not the ESP had viewed the entire contents of the uploaded file?

A.    Yes.

Q.    And what did Yahoo report?

A.    Yes, for all eight of the files.

Q.    And on most of the files, did it also contain a categorization by the ESP?

A.    Yes.

Q.    And what was that categorization?

A.    A1.

Q.    Which signifies?

A.    A prepubescent minor in a sex act.

Q.    Did you have an occasion to review the contents of section B that begins on page 7?

A.    Yes.

Q.    Did NCMEC provide any additional information regarding these files?

A.    Yes, they were categorized as apparent child

pornography and a child clothed.

Q.    Okay.  They provided the filename as well as a categorization that they had for the file?

A.    Yes.

Q.    In looking at section C on page 10 of Government's Exhibit No. 1D, did NCMEC provide any additional information regarding whether or not any staff members had viewed the files?

A.    Yes.

Q.    What information did they provide?

A.    Five of the files had been viewed and three of them had not.

Q.    After reviewing the contents of this particular CyberTip, Government's Exhibit No. 1D, what action, if any, did you take?

A.    I looked at the files.

Q.    And why did you look at the files?

A.    Because the electronic service provider had looked at them and they were also indicated they were child pornography.

Q.    And based on the categorization and the information provided, it contained -- whether it would be from NCMEC or from the internet service provider, did you have a belief that the files attached contained child pornography?

A.    Yes.

Q.    In addition to reviewing the files in these four

reports, did you have an occasion -- you indicated previously that you sent subpoenas to the internet service provider.  Did you do anything further in the investigation once you looked at those files?

A.     No.

Q.     Did you provide descriptions of what you saw in each of those attachments to anybody else in law enforcement?

A.     Yes.

Q.     And what was the purpose of providing the descriptions?

A.     Agent Randall was going to get a search warrant.

Q.     And so you provided information as to what you observed in each of those files?

A.     Yes.

Q.     And did you, in fact, ultimately participate in a search warrant?

A.     Yes.

MS. VIACAVA:  At this time, the government would ask to approach the witness.  May I approach the witness freely?

THE COURT:  Yes, you may.

BY MS. VIACAVA:

Q.     Looking at Government's Exhibit No. 2A and 2B, were these CyberTips or supplemental reports that you received?

A.     Yes.

Q.     In looking at Government's Exhibit No. 2A and 2B,

what type of information is contained within these CyberTips?

A.        This CyberTip had additional information about who they believed to be the subscriber to these accounts that were reported.

Q.        And who submitted these supplemental reports that you reviewed?

A.        One was submitted by Yahoo and the other was submitted by Google.  Or -- I'm sorry, they were both Yahoo.

Q.        Okay.  And this was information that was -- did you ask for this information or was this simply provided through NCMEC?

A.        No, it was provided through NCMEC.  I did not ask for it.

Q.        Okay.  And were you involved with directing any employees at Yahoo when they were making any of these CyberTips?

A.        No.

Q.        When they reported they looked at any of these -- that they looked at all of these files, was that at your direction?

A.        No.

Q.        To your knowledge, was law enforcement involved at all with them reporting this CyberTip?

A.        No.

MS. VIACAVA:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MS. VIACAVA:

Q.      While you were involved in this investigation, did you receive additional CyberTips from Google?

A.      Yes.

Q.      Do they appear to pertain to the same suspect?

A.      Yes.

Q.      And what drew you to that?

A.      Different variations of the email that were used, the numbers seemed to be a date of birth, the phone number on the account.

Q.      Okay.  So when you got all of these CyberTips, they appeared to relate to the same investigation?

A.      Yes.

Q.      And did you do the same inquiry to the Google CyberTips that came through?

A.      Yes.

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 3A that's been admitted into evidence.

Q.      Did you have the same inquiry looking at the incident type and the incident time?

A.      Yes.

Q.      So looking at the first report, Government's Exhibit No. 3A, were these reports, these CyberTips, coming in close in

time to one another?

A.        I received like the first couple together and then like a second batch like a month or so later.

Q.        Okay.  So within several weeks?

A.        Yes.

Q.        And did you review the suspect information?

A.        Yes.

Q.        Did you review the information provided by Google regarding how many files they uploaded that's on page 6 --

A.        Yes.

Q.        -- of Government's Exhibit No. --

        How many files did they indicate that they uploaded in this particular report?

A.        Two.

Q.        And did you have an occasion to review what was provided on each file?

A.        Yes.

Q.        And on the first file, does it indicate whether the ESP viewed the contents of the uploaded file in its entirety?

A.        Yes.

Q.        And what was the response?

A.        Yes, they did.

Q.        And did they provide a categorization of the file?

A.        Yes.

Q.        And what did they provide?

A.      B1.

Q.      And what does B1 signify?

A.      A prepubescent -- or a pubescent minor in a sex act.

Q.      And does it provide source information as to each of those two files as to the date and time of the upload?

A.      Yes.

Q.      And did you have an occasion to review that material?

A.      Yes.

Q.      In looking at what was provided, did the source information of the upload occur on the same date and close to the same time?

A.      Yes.

Q.      From the same -- involving the same email address?

A.      Yes.

Q.      Now, looking at the second file, did the ESP indicate whether or not they looked at the file in its entire contents?

A.      No.

Q.      They indicated no, they had not?

A.      Yeah, no, they had not looked at it.

Q.      Okay.  And have you received Google reports previously?

A.      Yes.

Q.      And are you familiar with their NCMEC reports?

A.      Yes.

Q.      Okay.  And on this particular report, on page 1 of

the report, was there information, company information provided?

A.      Yes.

Q.      And did you have an occasion to read what the company information was --

A.      Yes.

Q.      -- that was provided?

A.      Yes.

Q.      And in so doing, did it provide any explanation as to how Google answers those questions as yes or no?

A.      Yes.

Q.      And in this instance, looking at what's contained on Government's Exhibit No. 3A that's blown up on the screen, what does Google indicate when it responds no?

A.      When Google responds no, it means that while the contents of the file were not reviewed concurrently to making the report, historically, a person had reviewed a file whose hash, or digital footprint, matched the hash of the reported image and determined it contained apparent child pornography.

Q.      I believe it was digital fingerprint.

A.      Yes.

Q.      I think you said footprint.  I just want to make sure.

A.      Oh, sorry, fingerprint.

Q.      And based on your training and experience, are you

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

familiar with hash values or hash matches?

A.      Yes.

Q.      And, essentially, what is a hash match?

A.      Almost like your fingerprint for a photo.  If it's -- the photo's changed, the hash value will change.  So there's a system where these values are stored, and when a photo matches it, it's able to match with it.  It's identical.

Q.      Okay.  So looking -- were you aware of this information in terms of when Google responds no?

A.      Yes.

Q.      And did you also have an occasion to review section B that was contained in the report?

A.      Yes.

Q.      That is on page 8.

        Did NCMEC provide any information regarding the files?

A.      Yes, both of them were categorized as apparent child pornography.

Q.      Okay.  So NCMEC provided a categorization, but did you also review section C that's contained on page 13 of the report?

A.      Yes.

Q.      And did NCMEC indicate whether or not any staff members had reviewed the files?

A.      They were not viewed by NCMEC.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.       Okay.  After reviewing this particular report, what action, if any, did you take?

A.       I reviewed the files.

Q.       Okay.  Why did you review the files?

A.       Because one of them had been viewed by the electronic service provider and the other one was a hash match to something that was known in the system.

Q.       And had been -- and was it a file that was reported by Google?

A.       Yes.

Q.       And based on the CyberTip report that was made and the information that was contained within it, did you have reason to believe that there would be child pornography in those files?

A.       Yes.

Q.       Did you have an occasion to receive and review a CyberTip that has been admitted into evidence as Government's Exhibit No. 3B?

A.       Yes.

         MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 3B.

Q.       Did you review the contents of this particular report?

A.       Yes.

Q.       And in so doing, did it provide information as to the

incident date?

A.      Yes.

Q.      Was the date near or close in time to the previous report that was made by Google?

A.      Yes.

Q.      And did it provide information as to the incident type?

A.      Yes.

Q.      What was the incident type that was reported?

A.      Child pornography.

Q.      Did you have an occasion to review the suspect information?

A.      Yes.

Q.      In reviewing the report, did it tell you how many files had been uploaded?

A.      Yes.

Q.      How many files?

A.      One file.

Q.      And did it also provide you with information as to where the file -- where it had been located?

A.      Yes, in the Google photos infrastructure.

Q.      And did you have an occasion to review the section of the report in section A that provides information regarding this particular file and whether or not the internet service provider reviewed the contents in its entirety?

A.      Yes.

Q.      And what was reported?

A.      It was -- they answered no, again.

Q.      And, however, in this instance, is there a categorization provided?

A.      There is.

Q.      And what's the categorization?

A.      B1.

Q.      And what does B1 signify?

A.      A pubescent minor engaged in a sex act.

Q.      And is there additional information provided as to this file?

A.      Yes, it was in the categorization of apparent child pornography as well.

Q.      And --

A.      Or -- oh, the additional where Google, yeah.

Q.      And in this information, does it also provide additional information about the file that came from Google?

A.      Yes.  They indicate that a person at Google viewed the file to the extent necessary to confirm that it was child pornography.

Q.      Does it tell you when that review took place?

A.      Concurrently to or immediately preceding sending of the CyberTip.

Q.      And did you have an occasion to review section B that

was provided by NCMEC on page 4?

A.       Yes.

Q.       And did NCMEC provide any additional information regarding that particular file?

A.       Yes, it was categorized as apparent child pornography.

Q.       And did you review the section C on page 6?

A.       Yes.

Q.       And did NCMEC indicate whether or not they had looked at any of these files?

A.       They did not view the file.

Q.       Okay.  After receiving another CyberTip and reviewing the contents, what actions, if any, did you take?

A.       I viewed the files.

Q.       Why did you view the file?

A.       The electronic service provider indicated that they did as well as having a hash match that it was apparent child pornography.

Q.       So the idea that looking at this particular file, in considering that Yahoo viewed it to the extent necessary to confirm, did that signify to you whether a person had looked at it?

A.       Yes.

Q.       And did you have reason to believe that the contents of the file would be child pornographic in nature?

A.        Yes.

          MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 3C that's been admitted into evidence.

Q.        In reviewing the contents of this particular CyberTip, did you review the incident information that's contained on page 1?

A.        Yes.

Q.        And what was the incident date?

A.        It was 5/24 of 2021.

Q.        And did you review the suspect information?

A.        Yes.

Q.        And did you have an occasion to review the information provided regarding the file?

A.        Yes.

Q.        As well as the number of uploaded files?

A.        Yes.

Q.        How many files did they indicate been uploaded?

A.        One.

Q.        And did they provide information as to where the file or where the information had been found?

A.        Yes, the Google's photos infrastructure.

Q.        And in reviewing the contents of the file, did it indicate whether or not an employee of Google had reviewed the file?

A.          They didn't, but in the additional information, they explained.

Q.          Did they provide a categorization?

A.          B1.

Q.          And that signifies?

A.          Pubescent minor engaged in a sex act.

Q.          And under additional information, what did Google indicate regarding their access to the file?

A.          That a person at Google viewed the file to the extent necessary to confirm that it contained apparent child pornography concurrently to or immediately preceding the sending of the CyberTip.

Q.          And did you have occasion to view section B of this report?

A.          Yes.

Q.          And in so doing, did NCMEC provide any additional information regarding this particular file?

A.          Yes, there was a categorization of apparent child pornography.

Q.          And then did you have an occasion to review section C of the report?

A.          Yes.

Q.          And did -- section C on page 6, did Google indicate whether or not -- I'm sorry.  Did NCMEC indicate whether or not any of the files had been viewed?

A.       They did not review it.

Q.       After receiving this report, did you take any additional action?

A.       Yes, I viewed the file.

Q.       And why did you view the file?

A.       Because it had the categorization of B1 and it was categorized as apparent child pornography.

Q.       And did you also consider whether or not Google had accessed the file?

A.       Yes, and Google, the electronic service provider, indicated they viewed the file.

Q.       And in this case, it was to an extent that they felt necessary to determine it was child pornography?

A.       Yes.

Q.       And based on the categorization, based on the information provided, did you have reason to believe that the attachment contained child pornography?

A.       Yes.

Q.       And with these CyberTips, as you testified regarding the Google -- or the Yahoo, with these Google CyberTips, did you also have an occasion to provide descriptions of the files, attachments that you viewed to Agent Randall?

A.       Yes.

Q.       And to your knowledge, were those descriptions included as part of a search warrant?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

A.        Yes.

Q.        And to your knowledge, were those descriptions included in an affidavit for several search warrants in this particular case?

A.        Yes.

MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 4A that's been admitted into evidence.

Q.        Government's Exhibit No. 4A, was this a search warrant for the email accounts for Yahoo?

A.        Yes.

Q.        And these are the email accounts referenced in the CyberTips?

A.        Yes.

Q.        And are they included in the body of the application?

A.        Yes.

MS. VIACAVA:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

MS. VIACAVA:  So, at this time, the government would publish page 19 of Government's Exhibit No. 4A., 19 of the actual affidavit.

BY MS. VIACAVA:

Q.        In looking at -- have you had an occasion to look at all four of these search warrants involved in this case?

A.        Yes.

Q.       And looking at them, are the affidavits similar?

A.       Yes.

Q.       In terms of providing descriptions that were contained in the NCMEC reports?

A.       Yes.

Q.       And looking at this particular page, when it describes Task Force Officer O'Brien, that would be you; correct?

A.       Yes.

Q.       At the time, that was the name you were utilizing?

A.       Yes.

Q.       Okay.  And you're the individual that reviewed the files and provided the descriptions?

A.       Yes.

Q.       And you've had an occasion to review all those descriptions to ascertain that they are the descriptions you provided to Special Agent Randall?

A.       Yes.

         MS. VIACAVA:  At this time, the government would publish Government's Exhibit No. 4B that's been admitted into evidence.

Q.       Government's Exhibit No. 4B, what was this affidavit -- or what was this search warrant for?

A.       The Google email accounts.

Q.       And the email accounts referenced are the email

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

accounts that were contained in the CyberTips; correct?

A.        Yes.

Q.        And prior to what's been admitted into evidence as Government's Exhibit No. 4A and 4B, prior to those search warrants, did Google or Yahoo provide any additional information that was contained in the CyberTip to law enforcement without the search warrant?

A.        No.

Q.        Okay.

MS. VIACAVA:  At this time, the government would publish 4C that's been admitted into evidence.

Q.        Government's Exhibit No. 4C, what was this a search warrant for?

A.        This one is for the residence.

Q.        And were you present at the time the search warrant was executed?

A.        Yes, I was.

MS. VIACAVA:  At this time, the government would publish 4D that's been admitted into evidence.

Q.        What is this search warrant for in Government's Exhibit No. 4D?

A.        A vehicle.

Q.        A vehicle registered to Mr. Brillhart?

A.        Yes.

Q.        And it was substantially the same affidavit providing

the descriptions you observed in all four of those search warrant affidavits?

A.       Yes.

MS. VIACAVA:  One moment, please, Your Honor.

(Pause.)

MS. VIACAVA:  At this time, I'd publish Government's Exhibit No. 4C.

BY MS. VIACAVA:

Q.       Was this individual believed to reside in Lee County, which is why you got the CyberTips?

A.       Yes.

MS. VIACAVA:  No further questions, Your Honor.

THE COURT:  All right, we're going to take a ten-minute recess until quarter to 4:00.

You may step down.  Please don't discuss your testimony with anyone.  Thank you.

(Recess taken at 3:34 p.m. - 3:46 p.m.)

THE COURT:  Let the record reflect the defendant is present in court with counsel.

Mr. Davidow, cross-examination.

MR. DAVIDOW:  Thank you, Your Honor.

CROSS-EXAMINATION ON BEHALF OF THE DEFENSE

BY MR. DAVIDOW:

Q.       Good afternoon, Officer Lee.

A.       Hey.

Q.          I want to draw your attention back to Government's Exhibit 1A.  I have mine.  There's writing on mine.  I apologize, but let me pull that up.

THE COURT:  Allison, I think we need the screen down. And if you could turn the projector on.

MR. DAVIDOW:  Thank you, Your Honor.

BY MR. DAVIDOW:

Q.          This report 1A was -- it says here received by NCMEC on April 10, 2021.  Is that accurate?

A.          Yes.

Q.          And then you had gone through all of these reports in your direct with the government, and there's this section here, which I guess titled section A, reported information, and that's information that would come from, let's call it, the service provider; is that fair?

A.          Yes.

Q.          And then there's this section, the section B here, automated information added by NCMEC system, so this is information that is then, based upon what NCMEC gets, is now reviewed and more information is provided by NCMEC; is that fair to say?

A.          Yes.

Q.          And that's similar to this section C here; is that correct?

A.          Yes.

Q.        Additional -- sorry.

A.        Yes.

Q.        I didn't mean to talk over you.

A.        That's okay.

Q.        Just so the record was clear, it's yes?

A.        Yes.

Q.        Okay.  So is there anywhere in this report 1A where you could identify that the, let's call it, service provider used the information it had to do geolocating?

A.        So it -- let's see if this one has it.

So they give a list of the IP addresses that are here and, in turn, typically, those IP addresses are what NCMEC is geo-locating.

Q.        So they didn't give any geolocation points; is that accurate?

A.        No.

Q.        So NCMEC then looked at -- let's take 1A here.  Let's see.  In the body of the email -- scroll through here.  Okay?  So we're talking about page 4, these addresses?

A.        Yes.

Q.        And then -- so NCMEC takes this information and then uses something else to provide this information that we're looking at here on B -- what is this, subsection B; is that fair?

A.        Yes.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Q.        And I want to go now to subsection C.  It says here, right here in the middle, I put some brackets around it, there are multiple reports on this suspect, please see CT89347533 for all analysis.  Have you looked at 89347533?

A.        Yes, I believe that's the second CyberTip that she introduced.

Q.        The second CyberTip?

A.        That was in her exhibits, 2A.

Q.        Well, this is 1A was reported on April 15th.

A.        So the problem is that some of these CyberTips, like when I get them, I will get them together in the system or I could get one one week and I could get one two weeks later because there's a delay.  I don't know the rhyme or reason of how I get them in my system.

Q.        So we have this exhibit here, which is 2A; right?

A.        Uh-huh.

Q.        And this one was reported or received by NCMEC on April 23 -- right -- and it says 2A?

A.        Yes.

Q.        And that has this 89347533 number; right?

A.        Yes.

Q.        And this is a CyberTip line report, which is actually a supplemental report, is it not?

A.        Yes.  So NCMEC processed this.  If you look at the first tip, they processed the report actually on 4/27 of 2021.

So my assumption is in them processing this one, they received this one, so they were able to indicate that this information existed as well.  If you look at the first CyberTip on page 9.

Q.        You're talking about 2A?

A.        No, I'm talking about the very first one that you mentioned, 1A.

Q.        1A?

A.        If you look on page 9, it says that NCMEC actually processed that on 4/27 of 12021.

Q.        But isn't cyber --

A.        And that would be after this one was received.

Q.        But this one was received after the actual CyberTip for which this one, being 2A, was generated, was it not?

A.        Does this one say when they -- no, this one was generated on 4/23.  NCMEC processed this one on 4/27.  So in the mix of processing this one, they would have received this one.

Q.        Okay.  But this does say, on 1A, received April 15th?

A.        But just because they -- you'd have to talk to NCMEC.  Just because they received it that date, it's saying they processed it on 4/27.  And then it could have taken weeks through the databases for it to be assigned to me.

Q.        Now, if I go to -- let's see here.

A.        And actually, they were both processed on the same date.  This one says 4/27 as well.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

188

Q.        Now, I believe you said that you go into the database, you sign into the database.  Is that the NCMEC database?

A.        No, it's not NCMEC.  It's an ICAC database.  It's for our case management of where these -- how we get these CyberTips assigned to us.

Q.        So there's some type of separate computer system that holds assignments of NCMEC reports for you?

A.        Yes, I have a system that I log into with my credentials that I am able to view the CyberTips that are assigned to me.

Q.        So then it goes from NCMEC to -- what's it -- ICAC?

A.        Yes.

Q.        And then ICAC to you?

A.        Yes.

Q.        Does ICAC do anything with the files other than just store them?

A.        ICAC assigns these cases out for their affiliate agencies to work based on where the IP addresses are geolocated to.

Q.        So, from your understanding, it's just, basically, a sorter?

A.        Yeah, it's like -- it's a database that it's sent out.

Q.        Now, when you sign in to ICAC, can you see these

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

other NCMEC reports that exist?

A.    I can see the ones that are assigned to me and I have functions in there to be able to search for different things, but no, I can't see other leads that are assigned to other people.

Q.    So, like, but had you opened this one that we're looking at, 1A, you had some type of capability to type in this number and find that; is that fair?

A.    Once it's assigned to me.

Q.    And so if I were to go to 2A, this CyberTip here, and we see 2A, and I go to page -- what's the subsection here?  C I think it is.  Well, not 2A, it's going to be 3.  Excuse me.

MR. DAVIDOW:  Sorry, Your Honor.  Oh, here they are, here they are.  I was just looking for the 3s.

Q.    Okay.  So then if I go to this report, 3A is the exhibit and it's CyberTip 934851, and I go to that subsection C here, it says there are multiple reports on this suspect. Please see 91186992 for analysis.

A.    Yes.

Q.    And 911 -- let's find it here -- 86992 for analysis is 2B; correct?

A.    Yes.

Q.    And 2B, from the ESP, was provided by whom?

A.    Yahoo.

Q.    And the NCMEC number that you got for CyberTip 3A,

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

the ESP was whom?

A.        Google.

Q.        Do you know whether Google has access to the internal files of Yahoo?

A.        I can't answer that.  I have no idea.

Q.        Do you know whether Yahoo has access to the internal files of Google?

A.        I don't know.

Q.        But NCMEC was able to provide the ISP relationship in that additional section subsection C regarding the reporting of another ESP; correct?

A.        Yes.

Q.        And the reporting of that other ESP is not contained in section A; correct?  Meaning the other ESP.

A.        Of which CyberTip?

Q.        Any CyberTip.

A.        No.

Q.        1A, B, C, D.

A.        If they indicate -- when NCMEC provides the additional details, it could be something as simple as a phone number that they're linking it to with the reports or an email address, other information like that.  When I'm investigating these, that's quite common.

Q.        And you had said -- oh, as you were asked a general question on all these CyberTips, that it appeared that they

were reviewed by someone at the ESP.  Do you recall that?

A.        There's a question that indicates they were.

Q.        Do you have any independent verification that it was reviewed by a human?

A.        No.

Q.        And in fact, there are times where an ESP has, let's call it, automatic reporting to the CyberTips; correct?

A.        I don't know.

Q.        Meaning where no -- where it actually states no human viewed the file?

A.        It usually has an explanation.  It will say no, but that's a different service provider and it depends on the service provider, what their process is.

Q.        And there are times where it could just be provided because it matched a hash tag value; is that fair?

A.        Yes.

          MR. DAVIDOW:  I don't have any further questions. Thank you, Your Honor.

          THE COURT:  Any follow-up?

          MS. VIACAVA:  Just briefly.

   REDIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT

BY MS. VIACAVA:

Q.        When defense counsel was asking you about CyberTips being linked, that was information provided by National Center for Missing and Exploited Children; correct?

A.          Yes.

Q.          That was not information contained or provided by the internet service provider itself or the electronic service provider?

A.          No, they were two separate sections.

Q.          And based on your training and experience, is NCMEC the clearinghouse for the CyberTips?

A.          Yes.

Q.          And NCMEC looks at each CyberTip that comes in to determine where the suspect may be located?

A.          Yes.

Q.          And as such, as they do their processing, they can report -- or have you had experience at times where they report that tips, CyberTips, may be linked?

A.          Yes.

Q.          And is this what happened in this particular case?

A.          Yes, based on the information.

Q.          And that was the information provided from NCMEC?

A.          Yes.

            MS. VIACAVA:  No further questions, Your Honor.

            THE COURT:  May this witness be excused?

            MS. VIACAVA:  Yes, Your Honor.  And the government does not have any additional witnesses.

            THE COURT:  Thank you.

            You may step down.  You are excused.  Thank you.

(Witness is excused at 4:01 p.m.)

MS. VIACAVA:  May I retrieve the exhibits, however?

THE COURT:  Yes.

Mr. Davidow, the government has rested their presentation.  They have no further witnesses that they wish to call.  Do you wish to call any witnesses at this time?

MR. DAVIDOW:  No, Your Honor.  I would just like to review some of the documents that have been entered into evidence.  I could do that in closing, however you want to reference it, but we've agreed to admit them and --

THE COURT:  Okay.  Your documents?

MR. DAVIDOW:  Yes.

THE COURT:  Okay.  Yeah, that would be fine to do in closing.

MR. DAVIDOW:  Okay.

THE COURT:  Mr. Brillhart, I just need to advise you that you do have a right to testify during this evidentiary hearing.  It's really up to you if you choose to do so.  You can discuss that issue with your attorney.  He has indicated that he's going to argue from the documents that have been admitted.  I'm sure the government's documents, because they're more or less joint exhibits, he agreed with those, and then his exhibits that he has also introduced.

Have you had a chance to speak with your attorney about whether or not you want to testify during this hearing?

(Pause.)

THE DEFENDANT:  Yes, Your Honor, we discussed it.

THE COURT:  All right.  And do you want to testify during this hearing?

THE DEFENDANT:  No, ma'am.

THE COURT:  All right, thank you.

All right.  So the defense then would have no witnesses to present.  You just wish to argue from the exhibits that were admitted; correct?

MR. DAVIDOW:  Yes.  And then the cross-examination of the --

THE COURT:  Absolutely. Okay.  All right.  Then, Mr. Davidow, it is your motion, so you may proceed.

MR. DAVIDOW:  So a couple things just to follow up. And I'll grab them, Your Honor, if I may.

Exhibit 12 is a response letter that we got from Yahoo and AOL's counsel, and not so dissimilar to this Court's ruling, Exhibit 10 is the -- yeah, Exhibit 10 is the non-party subpoena that was sent to Yahoo.  Exhibit 11 is the non-party subpoena that was sent to Google.  Google didn't even respond to the non-party subpoena.  Yahoo responded with counsel.  And the letter from counsel -- I'll go through that in a second -- the request of what was asked for in the non-party subpoena. I'm going to have to find it here.

THE COURT:  Just to be clear, 11 looks like it was a

non-party subpoena to Oath, which would have been Yahoo.

MR. DAVIDOW:  Oh.  Oath, excuse me.

MS. VIACAVA:  Yes, Your Honor.  For clarification, I was going to indicate that the exhibits that I received, 10 and 11, both were subpoenas sent to Yahoo or Oath, which was part of Yahoo.  There isn't a Google subpoena.

MR. DAVIDOW:  Well, then that's a mistake.  That's just an error in copying on my office's part.  One of them should have been Google, if I'm not mistaken, unless we just provided two different ones.

THE COURT:  I don't have the exhibit in front of me. I'm only going from your description.

MR. DAVIDOW:  Okay.  So then no, actually, this may be -- this is a follow-up to Oath.  I mean, we didn't even do the one from Google.

THE COURT:  Okay.

MR. DAVIDOW:  So that's fine.  There's two.  I guess the issue -- it's not -- let's just put it this way:

It wasn't easy to try to get the non-party subpoenas served.  The requests in the non-party subpoenas was, essentially, for the same thing.  We were asking Oath for the information relating to the database.  I'm trying to find that in my subpoena now.

I don't know why I can't find it.  Oh, here it is. It's on the first page.  I was wondering why I had a hard time

finding it, but the dates, times, names of your employees and contact information for all those reporting persons, employees who personally reviewed the files, reported to NCMEC referenced in CyberTip line and we gave 89005640 prior to its submission. And that's a similar request.

The response we got from counsel for Yahoo was that they objected to the providing of any of that information. They said that, as I believe was argued by the government and the Court, essentially, we could read through it, but that the identity was not disclosed for purposes of protection of the employees, which, again, is not, let's call it, not understandable. It is understandable, but I think that there's a little bit more that needs to be reviewed when we're talking about constitutional issues and constitutional rights.

There was a follow-up in this that said, regarding the request in the subpoena for dates and times, that Yahoo employees viewed the files in question. Yahoo will provide you with that information, to the extent it exists, in short order. We have not received anything back even with those lists. I think the questions that we asked -- and I want to get the names right -- Ms. Kramer from Yahoo or Oath I think was pretty clear that there is certain databases maintained. Ms. Kramer worked in that division. She had a lot more, let's call it, working information of how some of those models and systems worked for which this ESP, being Yahoo or Oath, makes that

reporting. I'm not sure that we got the same thing from Ms. -- I don't want to mispronounce her name -- Shrestha -- from Ms. Shrestha at Google.

And so as to some of these facts, and I'll try to bring them all in, I want to start with a quote, a quote from Justice Scalia in *Crawford*, and it's at 541 U.S. at 62, at page 62, and he says here, "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty."

And so what we have here in these situations is that we have a body of case law that has lessened, let's call them, hearsay elements and objectivity at suppression hearings. And understandably, in certain circumstances, that makes sense. However -- and not trying to swim against the tide here -- I think that there are certain circumstances that we have to look at, as in this case, where we have the evidence come in, but clearly, for the Court, for government, this -- whoever this person, this human, is all hearsay. It is. Without question. In fact, when asked about, Ms. Shrestha, does it have a name? Her answer was I don't know.

So we have a really, let's call it, verbose system, a system that's, in some respects, kind of scary, if you look at the advancements of like that Chat GTP, just talking about knowledge of internet and things out there. You have, which was in the testimony here, Google that has provided almost 2

million hash numbers, and if any one of those hash numbers matches, its bot or program, or whatever we want to call it, can immediately send a CyberTip.

Now, here's the problem with getting down to where we are right now in the case law and me starting out with a quote from Scalia and the confrontation clause.  We come to, which we cited in our motion -- I had it over here -- Justice Gorsuch, before he was Justice Gorsuch, and the case is Ackerman.  It's at 831 F.3d 1292.  And here, Gorsuch lays out very clearly NCMEC is a governmental entity.  Very clearly.  Every step you'd have to go through to determine whether or not NCMEC is a governmental entity, NCMEC is a governmental entity.  All the tips have to be sent to NCMEC.  There's no -- in fact, there's criminal penalties if they're not sent to NCMEC.

So, now, here's the question where we have the ability to have this ESP, whoever they may be, provide information with systems that, where this Private Search Doctrine was actually developed, was developed in a lot simpler circumstances, a lot simpler cases, and that is -- and let me go to it -- this is *United States v. Sparks*, 806 F.3d 1323.  Under the Private Search Doctrine, the Fourth Amendment allows police to replicate a prior search provided it stays within the same parameters.  These NCMEC reports don't stay within the same parameters.  These NCMEC reports have additional subsections like B and C.  Subsection B not only provides

geolocation, which Ms. Shrestha said that's not our stuff, we didn't send that. In fact, we wouldn't send that. And it provides for information relating to other reporting ESPs, which only thing she was testifying to was out of her own internal tool system, Ms. Shrestha from Google, and Ms. Kramer was testifying to Yahoo's internal systems. So Yahoo doesn't have Google's systems, nor does Google have Yahoo's systems. NCMEC has them both. NCMEC is taking an additional step, two additional steps, further additional steps without a warrant under this Private Search Doctrine. And this is very different than a situation where we have -- where was it -- was it *Walter*? *Walter* and *Jacobson*. And let's see here.

And in *Jacobson* -- let me quote it -- "How much the agent's actions led them to learning new information the employees did not uncover and how far the agents investigated intruded on the package owner's privacy interests beyond the employee's intrusion."

So this is not only a governmental entity, it's a governmental entity doing way more than what was just provided in saying here's this ESP, this image or whatever that we picked up. It's saying here's this person; here's these other people that are reporting this person; here's the location that we found of where this person can exist. There's a lot more that's going on with NCMEC.

And then let's get down to the, let's call it, the

end of this is the overarching confrontational issues and reliability, and that is within these systems, these automated systems that permit for now, let's call it, even if it's permissible, that NCMEC can add in more as a governmental entity, that these systems have no checks and balances for the accused.  Not just Mr. Brillhart, anyone, the accused, because under what we heard today, anyone with an email address -- we saw one from the mailer-daemon, mailer return email, that actually sent hash tagged database information that gets flagged.

So here's Yahoo sending an email from something in a database that can automatically be flagged and gets sent to law enforcement like Ms. Lee.  Ms. Lee looks at it and says yeah, that's child pornography.  And what happens?  Search warrant. And now you gotta try to figure out how to defend yourself and you have no way of determining the source of that.  Meaning oh, well, someone checked the mailer-daemon or not.  And there's a tremendous, tremendous danger in permitting some of these things going forward.  And it's not necessarily the Court's job to fashion law.  That's not what we do.  But we review the law and the policies and processes in front of us and how these things are going forward against the constitution and we say yes or no and that's really all it is.  And a yes allows it to continue.  And a no causes a change in the policies, processes, and procedures.  And this is a situation where I think the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Court has the opportunity to, let's call it, spur on some of the changes that would be necessary to safeguard Fourth Amendment rights.

And here, I think there's -- at the time that any of these cases that we looked at, the *Walters* case, the *Jacobson* case, and the ones that we cited in here, none of those were actually where this Private Search Doctrine is created were using such a verbose system that was always running, dedicated system, functions without human interaction, and for the accused to say okay, well, who was the human and for the government to say you don't have a right to know, that's a problem. That's a big problem. And it's not to say that there's not a way to protect that person. Sure, you can. There's lots of ways to do that. We've figured that out as a court system. But, here, we get a no from the Yahoo and we get a sustained objection from the Court. Understandable. However, in its relationship to the exercise and the protections under the Fourth Amendment in echoing, essentially, what Scalia has said, the confrontation clause, the right to be free from unreasonable searches and seizures aren't little things that are limited to a situational basis. And the reason that they're there and written in plain language is for us to look at situations like this and be able to apply what we've heard to the facts that do exist and also can exist.

And in understanding that, I think, here, by not,

one, even knowing that these ESP databases have names, because we don't know that. I asked Ms. Kramer do you know the names? She said no. I asked Ms. Shrestha do they have names? She said I don't know. I make a request through the subpoena process and I get an objection. So now here's an issue where he says he's also going to provide those lists of access times. Well, I don't have that either.

So now here's an issue for which we allegedly have these names. Ms. Kramer said six people. Ms. Shrestha had no idea. In fact, I think that's another interesting point for the Court to determine. There was not only Google employees in their terms but contractors. Who are these contractors? Where are they from? Are they part-time law enforcement? That would be a big problem, but we don't know that and we have no way of knowing that unless certain things change.

And so the point here, I think, is pretty simple is we haven't identified who the individual is. The reliance here is on hearsay. Just trust me. Somebody did it. And I don't think that just trust me sustains or withstands a constitutional attack. And beyond that, when we come back and we look at oh, the application of this, subsequent to the ESP providing it, we go far afoul with what NCMEC, as a governmental agency does, and that's clear. In that *Ackerman* case, Justice Gorsuch says, "In the present case, NCMEC reviewed the files at issue and it did so as a governmental

entity and it continues to do so today."

And so what we have here, and I don't think that was objected to, I don't think it was even remotely objected to by the government, is that it's gone far afoul of just looking at the photo.  It's now processed the photo.  It's now related the photo to other reports.  It's related IP addresses to Google or G -- maps locations.  It then gets sorted through this ICAC processing to somebody else to, you know, move forward.  And all of those files, all of them.  And we're able to save some time, fortunately.  All of those files were used to provide the affidavit that then later provided the search warrant.  So from its very start, I would say that this kind of secrecy of the hearsay is shaky ground.  And then once it gets to NCMEC, it now goes far afoul what's permissible by a governmental entity.

So I'd ask the Court to grant the motion to suppress.  Suppress the 4 -- it was Exhibit 4 -- the search warrant and the fruits of those search warrants.

Thank you, Your Honor.

THE COURT:  Thank you.

Ms. Viacava.

MS. VIACAVA:  Your Honor, defense counsel seems to be confused by the process.  Essentially, you have a situation where the internet service providers, when they become aware of child pornography, they're not acting and both individuals indicated law enforcement wasn't involved with them at the time

that they located child pornography on their platforms.  Both custodians of records or both individuals who testified indicated that their companies want to protect their product.  And both Google and Yahoo have terms of service that indicate that they won't tolerate illegal activity.  They talk about -- and in both of their transparency reports, they talk about trying to fight child exploitation material being placed on their products.  That is a private company, a private entity, that a subscriber, in this case, the defendant, decided to use their platforms.  So without any kind of help or assistance from law enforcement, those companies independent found child exploitation materials.  As the testimony came about, when they find it, they report it.  And they are complying with Title 18 United States Code Section 2258(a) that talks about reporting requirements for providers.

These internet service providers are not required to look for it, but when they become aware of it, they do have to report it.  And it indicates that, pursuant to its clearing role as a private, nonprofit organization and at the conclusion of its review in furtherance of its nonprofit mission, NCMEC shall make available each report made under subsection A1 to one or more of the following law enforcement agencies, including any federal law enforcement agency that is involved in the investigation of child sexual exploitation.

NCMEC is simply the clearinghouse.  When these

reports come in, the internet service providers aren't required to determine exactly what area of the country it has to go to. They send the information, the suspect information they have from the subscriber. They provide the attachments that they believe to contain child pornography. And they answer certain questions and let the NCMEC -- or CyberTip -- as part of the CyberTip, whether they view the contents in its entirety or what they, in fact, did.

In this instance, Yahoo was very clear. They looked at each and every file. So whether it was flagged for different reasons, before that CyberTip was made, a physical employee of Yahoo looked at each and every one of those files. Even Government's Exhibit No. 1B that contained 217 files. They looked at all of those before they made the tip. That was a private search that was done by a private company based on information that the defendant put on their platform. Therefore, it does not -- it does not bring to mind any kind of constitutional issues. It's a private search that was done. That information on all four of those reports contained in A1 through D, there were six files in the CyberTip in A1. There was 217 in B -- in 1B. There were ten files in 1C. And then there was eight files in 1D. For each of those Yahoo reports.

Yahoo, including the witness that testified, she actually prepared one of the supplemental reports. She indicated that she was able to do additional searches, again,

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

not based on law enforcement's involvement.  They had a willingness to want to keep that stuff off of their platforms.  Here it is they had to make four different reports on four accounts that they believed were linked or involved in trading, receiving, possessing child pornography.  As a result, in their CyberTip, they provided information that they themselves found doing searches on databases they had access to, whether checking the sex offender registry, they provided that information to NCMEC.

When you look at -- so all of those reports were provided to National Center for Missing and Exploited Children.  As the clearinghouse, National Center for Missing and Exploited Children will then look at what's provided, the CyberTips.  They will try to determine, based on the IP addresses that were given, what area of the country to send the tips to.  By looking at an IP address, they're not looking at anything that's protected.  It's an IP address that was captured by the internet service provider provided to them.

So when defense counsel talks about sections B and C, it's not looking any further than what the private company had done.  They're simply looking at the IP address now provided to them seeing what area of the country it belongs to and they provide that tip then to law enforcement.  So they have not exceeded anything that's private to the defendant at that point.  The information has already been provided by the

internet service provider.  And as the clearinghouse, as they started seeing, in this case, four CyberTips from Yahoo, three from Google, all involving same -- in many cases, the same phone numbers linked, same IP addresses, same account names, Reb Reb was used multiple times, slight variations to email addresses, NCMEC provided that information in subsection C to say hey, these look like these might be related, but they didn't look anything beyond.  NCMEC certainly didn't have access to the accounts.  They didn't go into Google or Yahoo. There was no testimony that they did anything other than receive the information.  In fact, NCMEC even went as far as to indicate if they looked at any of the files.  If they did, they advised which files.  And it was only an instance when the internet service provider had already looked at the whole files.  Otherwise, they may have run the hash value that was provided by the internet service provider.  They didn't go beyond that.  There was no testimony of anything done by National Center for Missing and Exploited Children that went beyond what was provided by the internet service provider. And, again, everything provided by the internet service provider was done on their own and they indicate they routinely do this anytime they find such material on their system.

With Google, they indicated in the first report, Government's Exhibit No. 3A, they viewed the contents of one file in its entirety.  The second one they acknowledge a

physical person at Google had seen it.  That's what was contained in the NCMEC report and that's what was testified to, that a physical person had previously seen it and they saw the hash value.  It was a file sent on the same date close in time to the other one.  They provided that.

The other two reports, 3B and 3C, it indicated they actually typed in to make it clear that they reviewed those files, which we heard testimony was videos, they viewed those files to the extent necessary to determine that it contained child pornography and they reported those attachments.  So all of those actions were done by the internet service providers after they became aware of the materials and it was based on their own systems in place.

So, again, law enforcement did not violate that.  Law enforcement, when they finally got the NCMEC tip and got all seven of those reports and two supplemental reports, you heard testimony from the individual, Task Force Officer Lee, that she looked at it.  She testified as to why.  She had reason to believe they contained child pornography.  She indicated Yahoo had said they looked at every single file so she wasn't going beyond that.  She indicated that Google, in the first report, indicated they looked at that entire file so she wasn't going beyond that.  She indicated that in reports 3B and 3C, the file attached by Google had also indicated they had looked at it to the extent that it contained child pornography.  So she had a

belief as to every single file, whether it be from Yahoo or from Google, that it contained child pornography.  And as a result, she then looked at those particular attachments and she provided descriptions for some of those files that were ultimately utilized in the search warrant.  You heard testimony from both Google and Yahoo witnesses that they -- that they did not have contact with law enforcement and they did not turn anything over until such time as a search warrant was obtained in this particular case.

So law enforcement, in this instance, did not exceed any of the searches already conducted by the internet service provider.  NCMEC did not go beyond any searches conducted by the internet service provider.  And the government would note on any of these CyberTips -- and I would, just for the sake of argument, I would publish Government's Exhibit No. 3C that was admitted into evidence.

If there was any confusion about the role of NCMEC, they indicate right there and it's also provided in the statute under 18 U.S.C. 2258(a)(C), that it is a clearinghouse role as a private, nonprofit organization.  This is not a governmental entity.  It does not work for the government.  It provides these leads to law enforcement that they obtain, but they did not do anything in the reports that went beyond what was provided to them.

Looking at an IP address already provided, that's not

further searching anything that's private to the defendant. That information is already out there. They looked at other sources and provided the geographic area of where that IP address belonged. Again, there's nothing untoward about such action. It's not accessing his account. It's not accessing anything he has an expectation of privacy in. When he utilizes or logs in to these internet service providers and they capture an IP address and those internet service providers provide that IP address to the National Center for Missing and Exploited Children, there's no expectation of privacy in that IP address. And IP addresses are something that is captured by most online stores, things of that nature. An IP address is not an expectation of privacy.

In this case, that's all the extent of what NCMEC did that went beyond that. They did not -- if they accessed the actual attachment, they indicated as such. They did not access the attachments in any of the instances beyond what the internet service provider indicated they did. In most of the reports, they indicated they didn't look at it. No staff member looked at it. In the few instances they did, there were Yahoo reports that Yahoo said they already looked at it and they looked at a small number versus what was reported by the internet service provider and it's all contained within the report. And there was testimony that law enforcement relied upon the information.

So if defense counsel is arguing that somehow if he doesn't have the name of the person from the private company that did something -- and by statute, it only indicates internet service provider. It doesn't say they have to name the person who actually did something. That is, again, action that took place in the private company. The private company had their own policies.

Certainly, in this instance, the fact that defense counsel can't find out the exact name, that's not something that is maintained by the government. We have no access to it. There's no allegation of any kind of discovery violation. It's not our records. It's the private company's.

As defense counsel pointed out, their own counsel did not want to provide that information. They didn't think it was relevant. And for the purposes here, it's enough that you have the company indicating we did this action, we looked at these files. We found them. We became aware. And we reported them. And that's what we have in this particular circumstance. You have an internet service provider complying once they become aware of child pornography on their site.

And the government would rely on its argument that's contained in docket number 57, the government's response. Specifically the Court can look at such cases at *United States v. Meals*. It's a Fifth Circuit case from 2021. It's cited at 21 F.4th 903. It indicates that NCMEC did not exceed the scope

of Facebook's search by merely reviewing the identical evidence that Facebook reviewed and placed in the CyberTip. And that's all we have here. There's no evidence that they exceeded anything, that they looked at any particular file that had not been looked at or identified by the internet service provider.

And, for example, in Government's Exhibit No. 1A, in the NCMEC report, NCMEC indicated they had reviewed one file that was uploaded by Yahoo, although, Yahoo indicated that they had reviewed all six files. So they did not exceed any search that was done. And that was in each case. And the testimony as we went through the files made clear that they did not look at any files that the internet service provider did not indicate they had already looked at.

In addition, the government would argue that, because the internet service providers had looked at these particular attachments that were placed on their platform, that it does not invoke the Fourth Amendment of protection. He has no legislate expectation of privacy. The company had already viewed this. The companies, both companies, have service -- terms of service that notify an individual that they are running these programs, they are reporting to NCMEC if they find such things, that law enforcement could be notified. It is made clear. And yet, in this instance, the defendant chose to uses those platform, chose to upload files that contained child pornography. In many of the instances, there were emails

that were being sent that contained child pornographic materials. And as each account was shut down, there became a new account that these internet service providers were locating with a slight variation to the filename. And, therefore, the warrantless law enforcement search conducted after the private search violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search. That's under *United States v. Jacobson,* 466 U.S. 109. It's a 1984 Supreme Court case.

In this case, there was no evidence that's been presented here today that indicates that law enforcement exceeded the search that was already conducted. Law enforcement simply replicated the initial private search conducted by Yahoo and Google. And looking at *Coolidge v. New Hampshire* at 403 U.S. 443, a 1971 Supreme Court case, the police need not avert their eyes when presented with evidence obtained in a private search, and that's, essentially, what happened in this particular case.

In addition, the defendant frustrated or eliminated any expectation of privacy by uploading and sending child pornography over Yahoo and Google, which are private companies that routinely report CyberTips to NCMEC when they become aware that a customer is sending child pornography using their products or services. And since Yahoo, a private company, had filed -- had viewed each file provided in four CyberTips and

provided the files to the National Center for Missing and Exploited Children, then law enforcement did not meaningfully exceed the search of Yahoo's search by reviewing the files. And we would reference *United States v. Harling* at 705 Fed.Appx. 911, an Eleventh Circuit 2017 case, which also referenced *Jacobson*.

The government would argue that the Court should deny this particular motion that's been raised. In addition, if the -- just -- if, per chance, the Court were to buy into defendant's argument that somehow NCMEC and the internet service provider were somehow working with law enforcement and somehow exceeded any particular search or right to privacy the defendant had, we would also argue that law enforcement here acted in good faith. They had information and the information indicated Yahoo had looked at every file. They have no reason to disbelieve that. Defense counsel is asking about a particular name. What's reported is yes, they did. When they came to court, they indicated yes, we did.

So, as a result, the government would argue that all seven of these reports were referenced in the affidavit. At best, there is one file by Google, which is Government's 7A, that was based upon a hash value where they physically had looked at it previously. There's nothing that indicates they have to keep looking at this stuff, but there was one file out of over 200 that were reported that had not been looked at

contemporaneous with making the reports.  Everything else had been done prior to the reports being made close in time as indicated by Google, as indicated by Yahoo.  So there's one. One file, at best.

And so, certainly, it can be argued that law enforcement acted in good faith.  They looked at -- you heard testimony from Task Force Agent Lee that she's used to receiving CyberTips from Yahoo and Google.  They are reliable sources of information.  She's used to seeing their types of reports.  When they indicate they have a categorization, she testified she believed that the materials attached would be child pornography based on the fact that they viewed it, they provided information about it, they provided the category of the file, and we would argue that, based on the *United States v. Leon*, if the Court found that it was necessary to look at anything further for suppression, we would argue that there's a good faith exception to the exclusionary rule.

The Supreme Court regards exclusion of evidence as an extreme sanction that should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further purposes of exclusionary rules, which center on deterring police misconduct under *United States v. Leon*, 468 U.S. 916, a 1984 Supreme Court case.

Essentially, when defense counsel argues about automated systems and bots and all the terms he threw out

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

there, he's talking about what the internet service providers utilized, the process they utilized. But the bottom line is Yahoo indicated, however it was flagged, a physical person from Yahoo, from their trust and safety team, looked at each file before making those reports. Google indicated that of the four files that they attached, one was looked at in its entirety, two were looked at to the extent necessary to determine it was child pornography, and one was based on a hash value that they recognize because they had someone in Google physically look at that file and it was looked at as being -- with the hash value as being an exact match. That is the information law enforcement had; that is what they utilized; and they ultimately obtained a search warrant for the email accounts for both Google and Yahoo, the car, and his residence to further their investigation. But they did not act in bad faith; they did not exceed the searches that were done; and we would argue that this motion should be denied.

THE COURT: Thank you.

Mr. Brillhart, the Court has heard all of the evidence and testimony that it is going to hear on the issue of the motion to suppress. I will consider the testimony of the witnesses, the exhibits that were introduced into evidence, and the arguments of counsel in making my decision.

I think currently set -- is it the next trial cycle?

THE DEPUTY CLERK: Yes, Your Honor.

(Court and clerk confer.)

THE COURTROOM CLERK: I believe they're on the April trial cycle with a March status. I'm just confirming.

MS. VIACAVA: Yes, Your Honor. When we had the last status that took place on February 13th, it was moved or continued to the April trial calendar with a status date of March 13th at the defense request because this motion was pending.

THE COURT: All right. So the Court will make its decision and I'm sure that Mr. Davidow will come and speak to you about whatever that Court's decision is.

All right. Then the defendant, at this time, is remanded to the custody of the Marshal Service.

Go ahead, Ms. Viacava.

MS. VIACAVA: Your Honor, I'm sorry, just one more thing that was brought to my attention.

While we were going through the exhibits, Exhibit 3B was one of the reports. The date of birth on that one had not been redacted. I've spoken with defense counsel. If it's acceptable to the Court, we would ask to substitute an exhibit in. At this late stage, it will probably be tomorrow morning just so we can redact that so it doesn't become public and we protect all the PII. I thought I had done it in all the reports. Apparently missed that one for 3B.

THE COURT: All right.

And that's no objection?

MR. DAVIDOW:  No objection, Your Honor.

THE COURT:  All right.  Then you may go ahead and substitute that specific exhibit --

MS. VIACAVA:  Thank you.

THE COURT:  -- once you've redacted it.

All right.  The defendant is remanded at this time to the custody of the Marshal Service and we'll be in recess on these proceedings.  The parties are excused.  Thank you.

MR. DAVIDOW:  Thank you, Your Honor.

(Proceedings were concluded at 4:43 p.m.)

* * * * * * * * *

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CERTIFICATE OF REPORTER


UNITED STATES DISTRICT COURT )

MIDDLE DISTRICT OF FLORIDA   )


I, Stacey E. Raikes, RMR, CRR, Official Court Reporter for the United States District Court, Middle District of Florida, do hereby certify, pursuant to Section 753, Title 28, United States Code, that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes taken by the undersigned in the above-entitled matter to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Fort Myers, Lee County, Florida, this 17th day of April 2024.


_____
STACEY E. RAIKES, RMR, CRR
Official Court Reporter